# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2019-NMCA-048**

**Filing Date: March 6, 2019**

**No. A-1-CA-36122**

**STATE OF NEW MEXICO,**

 Plaintiff-Appellee,

v.

**MILO BENALLY,**

 Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**John A. Dean Jr., District Judge**

Certiorari Granted, September 9, 2019, S-1-SC-37613, Certiorari Denied, June 13, 2019, S-1-SC-37629.  Released for Publication September 24, 2019.

Hector H. Balderas, Attorney General
Santa Fe, NM
Walter M. Hart III, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**HANISEE, Judge.**

**{1}** Defendant appeals from his convictions for two counts of possession of a deadly weapon by a prisoner in violation of NMSA 1978, Section 30-22-16 (1986), for which he was sentenced to consecutive nine-year terms, or a total of eighteen years'

incarceration.[1] He contends that neither conviction was supported by substantial evidence and that the separate convictions violate his right to be free from double jeopardy. We reject Defendant's challenge to the legal sufficiency of the evidence, but agree that the two convictions violate the prohibition against double jeopardy.

**BACKGROUND**

{2}     Prison staff received information from an inmate that prompted a "shakedown" of the particular area of the prison where Defendant was housed. This entailed the systematic removal of inmates and an ensuing search for contraband, including the bunk and shower areas of the "pod" that was the subject of concern. The area searched by prison staff was an open, dormitory-style space with approximately six to eight recessed bunk units, each containing about six bunks.

{3}     Defendant slept on the bottom mattress of a three-stack bunk, with the middle bunk being vacant. In Defendant's bunk area were pieces of legal paperwork, mail, and other items that bore only Defendant's name. On an "L" shaped support bar of the vacant, middle bunk at the top of Defendant's bunk area, prison staff found a shaving razor with a playing card folded around it to form a handle (razor weapon). Upon discovering the razor weapon, prison staff removed the mattress from Defendant's bunk and noticed a four- to five-inch slit in its side. They cut open the mattress and found a sharpened piece of the end of a plastic mop handle (mop weapon) concealed within. Approximately eighty feet away in the shower area of the pod, prison staff next found orange plastic shavings that matched the end of a mop handle found in a shower stall and similar residue ground into the concrete lip of the shower pan. After checking a utility closet that contained items used by inmates to clean their cells, prison staff also determined that an end to one of the plastic mop handles had been removed.

{4}     Upon discovery of the two makeshift weapons, Deputy Jason Sherman spoke with Defendant but did not inform him of any specifics associated with the discovery of the weapons. Deputy Sherman told Defendant only that he wanted to "speak with him about the incident at the jail today." During the conversation, Defendant expressed feelings of "hate and anger" toward a particular inmate and stated that he wanted to "cut that guy's head off." Obliquely referring to what was found during the prison search, though not identifying any specific item or object by name, Defendant also stated, "Check this out, Sherman. What if that thing is mine?" Defendant went on to say that (1) the prison staff should be glad they found what they were looking for; (2) had he been asked, he simply would have told the prison staff to "pull all the mattresses and that would have been the end of it"; and (3) some things "could have gone down, but that God was looking out" and pulled Defendant through the situation before he "lost it" and "something . . . [went] down." Despite these statements, when asked to admit the weapons were his, Defendant declared, "I don't believe in statements because I could

---

[1]Defendant also received an eight-year habitual offender enhancement for each count of conviction, resulting in a total prison sentence of thirty-four years for the two possession charges.

lie and say it ain't mine and be lying out my ass and still get charged. Or I could say, 'Yes, it's mine,' and still get charged with it."

**{5}** Defendant was charged with two counts of possession of a deadly weapon or explosive by a prisoner, contrary to Section 30-22-16. At trial, Defendant testified that the razor and mop weapons were not his and he did not know what Deputy Sherman was referring to during their conversation following the discovery of the weapons. The jury returned guilty verdicts on both counts.

## DISCUSSION

### I. Sufficiency of the Evidence

**{6}** Defendant argues that his convictions are not supported by substantial evidence. Specifically, he contends that because "[t]he weapons in this case were accessible to anyone in the pod[,] every inmate in the pod could have exercised control over them[,]" thus precluding a finding that Defendant, and not any other inmate, possessed the weapons.

**{7}** "To determine whether the evidence presented was sufficient to sustain the verdict, we must decide whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Brietag*, 1989-NMCA-019, ¶ 9, 108 N.M. 368, 772 P.2d 898. Substantial evidence consists of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *See State v. Salgado*, 1999-NMSC-008, ¶ 25, 126 N.M. 691, 974 P.2d 661. We view the evidence in the light most favorable to the verdict, "indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We disregard all evidence and inferences that support a different result. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. "We do not reweigh the evidence and may not substitute our judgment for that of the fact[-]finder, so long as there is sufficient evidence to support the verdict." *Brietag*, 1989-NMCA-019, ¶ 9.

**{8}** In it is entirety Section 30-22-16 provides:

> Possession of deadly weapon or explosive by prisoner in lawful custody consists of any inmate of a penal institution, reformatory, jail or prison farm or ranch possessing any deadly weapon or explosive substance.
>
> Whoever commits possession of deadly weapon or explosive by prisoner is guilty of a second degree felony.

The only element at issue in this appeal is the statutory requirement that the forbidden weapons at issue were *possessed* by Defendant. Because the weapons were not found

on Defendant's person but were discovered concealed above his bunk and within his mattress, this case turns on constructive, not actual, possession. *See State v. Barber*, 2004-NMSC-019, ¶ 22, 135 N.M. 621, 92 P.3d 633 (describing the differences between actual and constructive possession and explaining that "[w]hen actual physical control cannot be directly proven, constructive possession is a legal fiction used to expand possession and include those cases where the inference that there has been possession at one time is exceedingly strong" (internal quotation marks and citation omitted)).

**{9}** "Constructive possession exists when the accused has knowledge of [the prohibited items] and exercises control over them." *State v. Phillips*, 2000-NMCA-028, ¶ 8, 128 N.M. 777, 999 P.2d 421. While "the mere presence of the contraband is not enough to support an inference of constructive possession[,]" *id.*, a person can be convicted of possession even "without proof that he [or she] was the exclusive occupant" of the area where the contraband was located. *State v. Muniz*, 1990-NMCA-105, ¶ 15, 110 N.M. 799, 800 P.2d 734. When exclusive control is at issue, "[a]dditional circumstances or incriminating statements are required." *Phillips*, 2000-NMCA-028, ¶ 8. "The accused's own conduct may afford sufficient additional circumstances for constructive possession." *Id*. We "must be able to articulate a reasonable analysis that the fact-finder might have used to determine knowledge and control." *State v. Garcia*, 2005-NMSC-017, ¶ 13, 138 N.M. 1, 116 P.3d 72 (alteration, internal quotation marks, and citation omitted).

**{10}** Based on the evidence at trial, we conclude that the jury could have reasonably inferred that Defendant had knowledge of and control over both weapons. To begin, numerous statements were attributed to Defendant that the jury could have taken as evidence that Defendant had knowledge of the weapons. Even though Deputy Sherman did not inform Defendant of the specific items found by prison staff, Defendant posed a question to the deputy—"Check this out, Sherman. What if that thing was mine?"—from which, in context, the jury could reasonably infer that Defendant had knowledge of the contraband found, i.e., the weapons hidden in the bottom bunk area. Significant to our analysis are Defendant's expression of hatred and anger toward another inmate, his acknowledgement that he wanted to do harm to that person, and his stated appreciation that prison staff conducted the search when they did, i.e., before Defendant "lost it" and "something . . . [went] down." These statements, coupled with Defendant's acknowledgement that had prison staff asked, he would have told them to "pull all the mattresses and that would have been the end of it[,]" provided sufficient evidence from which the jury could infer that Defendant had knowledge of the weapons. *See State v. Jimenez*, 2017-NMCA-039, ¶ 48, 392 P.3d 668 (holding that the state can prove knowledge through circumstantial evidence demonstrating "that the defendant knows of the presence and character of the item possessed" (internal quotation marks and citation omitted)).

**{11}** Further, and with respect to the essential element of control, prison staff discovered numerous items bearing Defendant's name in the bottom bunk where the weapons were discovered, supporting the conclusion that the bunk was, indeed,

Defendant's. Additionally, both weapons were easily accessible to—and, indeed, *only* within arm's reach of—the person occupying that bunk, i.e., Defendant. *See Barber*, 2004-NMSC-019, ¶ 27 (providing that "[e]vidence of control includes the power to produce or dispose of" the contraband). This takes on added import in light of the testimony elicited from a fellow inmate indicating that if one inmate had an issue with another inmate, the first inmate was likely to keep a weapon in his mattress for easy access.

**{12}** Because there is evidence from which the jury could reasonably infer that Defendant had knowledge of and control over the weapons, we conclude that Defendant's convictions are supported by substantial evidence.

## II. Double Jeopardy

**{13}** Defendant contends that his convictions violate his right to be free from double jeopardy. Whether multiple convictions violate the prohibition against double jeopardy involves "a constitutional question of law which we review de novo." *State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747. "The Double Jeopardy Clause protects criminal defendants against multiple punishments for the same offense." *State v. Bernard*, 2015-NMCA-089, ¶ 15, 355 P.3d 831 (alteration, internal quotation marks, and citation omitted). There are two types of "multiple punishments" cases: "double description" cases, "in which a defendant's single course of conduct results in multiple charges under different criminal statutes," and "unit-of-prosecution" cases, "in which a defendant faces multiple charges under the same criminal statute for the same conduct." *Id.* ¶ 16. This is a unit-of-prosecution case.

**{14}** In unit-of-prosecution cases, the "relevant inquiry . . . is whether the [L]egislature intended punishment for the entire course of conduct or for each discrete act." S*wafford v. State*, 1991–NMSC–043, ¶ 8, 112 N.M. 3, 810 P.2d 1223. To discern the Legislature's intent, we apply a two-step analysis. *See Bernard*, 2015-NMCA-089, ¶ 17. "First, we review the statutory language for guidance on the unit of prosecution." *State v. Bernal*, 2006-NMSC-050, ¶ 14, 140 N.M. 644, 146 P.3d 289. If the plain language of the statute is unclear or ambiguous, "we move to the second step, in which we determine whether a defendant's acts are separated by sufficient 'indicia of distinctness' to justify multiple punishments under the same statute." *Id.* If the second step of the analysis does not demonstrate sufficient distinctions between the acts, we apply the rule of lenity and presume that the Legislature did not intend to impose multiple punishments where the acts are not sufficiently distinct. *See State v. Tidey*, 2018-NMCA-014, ¶ 16, 409 P.3d 1019 (explaining that "the rule of lenity favors a single unit of prosecution and disfavors multiple units of prosecution" (alterations, internal quotation marks, and citation omitted)); *Bernard*, 2015-NMCA-089, ¶ 17 (explaining that "[t]he rule of lenity requires that we interpret the statute in the defendant's favor by invoking the presumption that the Legislature did not intend to create separately punishable offenses").

**The Unit of Prosecution in Cases Involving Crimes of Possession**

**{15}**   As our Supreme Court recently observed, "the unit of prosecution defines *how many* offenses the defendant has committed." *State v. Ramirez*, 2018-NMSC-003, ¶ 46, 409 P.3d 902 (internal quotation marks and citation omitted). Ordinarily, the unit of prosecution is defined by "the actus reus, the physical conduct of the defendant." *Id.* (internal quotation marks and citation omitted). However, when it comes to possession-based crimes, our jurisprudence suggests the unit of prosecution may be defined in two ways: (1) by the physical conduct of the defendant—i.e., the act of possessing contraband as of a specific point in time—*or* (2) by the individual items possessed. *Compare State v. Olsson*, 2014-NMSC-012, ¶¶ 3, 47, 324 P.3d 1230 (considering whether possession of multiple, distinct images of child pornography were separately punishable acts or "one unitary act of possession[,]" and concluding that the defendants could "only be charged with one count of possession"), *and Tidey*, 2018-NMCA-014, ¶¶ 9, 15 (applying a unit-of-prosecution analysis to determine whether the simultaneous possession of two different types of drug paraphernalia constituted "one unitary act" or separately punishable acts, and concluding that possession of two items of contraband was a single punishable act), *with Bernard*, 2015-NMCA-089, ¶¶ 16, 31 (considering whether the defendant's possession of four stolen vehicles "constitutes a single course of conduct that is punishable as only one violation" and concluding that the defendant could be punished separately for each stolen vehicle he possessed). The recent cases cited above, addressing double jeopardy challenges to multiple convictions under possession statutes, have all concluded that the statute under consideration was ambiguous as to the unit of prosecution. *See Olsson*, 2014-NMSC-012, ¶ 23 (concluding that the plain meaning as to the proper unit of prosecution under the possession of child pornography statute, NMSA 1978,  § 30-6A-3 (2016), is ambiguous); *Tidey*, 2018-NMCA-014, ¶ 10 (same with respect to the possession of drug paraphernalia statute, NMSA 1978, § 30-31-25.1 (2001)); *Bernard*, 2015-NMCA-089, ¶¶ 18-19 (same with respect to the possession of a stolen vehicle statute, NMSA 1978, § 30-16D-4 (2009)).

**Section 30-22-16 Is Ambiguous as to the Applicable Unit of Prosecution**

**{16}**   Here, the State concedes that the plain language of Section 30-22-16 does not clearly and unambiguously express the applicable unit of prosecution. While we are not bound by the State's concession, *see State v. Caldwell*, 2008-NMCA-049, ¶ 8, 143 N.M. 792, 182 P.3d 775 (refusing to be bound by the state's concession that the defendant's conduct in that case was unitary and undertaking its own analysis after noting that "[t]he public interest in criminal appeals does not permit their disposition by party stipulation" (internal quotation marks and citation omitted)), we agree that Section 30-22-16 does not plainly define the Legislature's intended unit of prosecution for violations of that statute.

**{17}**   As noted above, Section 30-22-16 defines the conduct proscribed by its terms in a single sentence: "Possession of deadly weapon or explosive by prisoner in lawful custody consists of any inmate of a penal institution . . . possessing any deadly weapon or explosive substance." *Id.* As with other possession-based statutes, Section 30-22-16 is facially ambiguous as to the unit of prosecution because it can be construed as

intending either a single punishment based on the actus reus of "possession," or instead multiple punishments based on each individual deadly weapon possessed. *Cf. Bernard*, 2015-NMCA-089, ¶¶ 18-19 (concluding that the statute criminalizing possession of a stolen vehicle was ambiguous where the statutory language did not "provide clear guidance as to whether the specific type of [item possessed] may constitute the proper unit of prosecution for multiple violations" and was "silent as to whether the number of [items] unlawfully possessed by a defendant may be charged as separate offenses"). Concluding that Section 30-22-16 is ambiguous as to the intended unit of prosecution, we turn next to determining whether, based upon the facts of this case, Defendant's conduct in possessing the razor weapon and the mop weapon "is better characterized as one unitary act, or multiple, distinct acts, consistent with legislative intent." *Tidey*, 2018-NMCA-014, ¶ 9 (internal quotation marks and citation omitted).

**"Indicia of Distinctness" Analysis**

**{18}** To determine whether separate convictions are justified under Section 30-22-16 for each of the weapons found in Defendant's possession, we consider whether the convictions were supported by sufficient indicia of distinctness. We may look to "time and space considerations" as well as the "quality and nature of the acts, or the objects or results involved." *Tidey*, 2018-NMCA-014, ¶ 11 (internal quotation marks and citation omitted).

**{19}** As to time and space considerations, the State argues that "the evidence demonstrates that Defendant's possession of each weapon commenced at a different time—at the distinct moments when Defendant created each weapon[,]" thereby allowing separate punishment for "distinct and separate[] . . . violations of [Section] 30-22-16." Yet the State fails to point to anything in the record establishing—or even supporting the inference—that it was Defendant who created either of the weapons. Granted, Daniel Webb, an officer at the detention center, testified that he found evidence in a shower stall, some eighty feet from Defendant's bunk, suggesting that the mop weapon had been crafted there. However, the State points to no testimony or evidence from which the jury could reasonably infer that Defendant was the person who created either of the weapons, nor does our review of the record reveal any such evidence. Moreover, the State made no claim or showing that the shower area was in Defendant's exclusive control or that Defendant was seen or admitted to creating either weapon. And while the State points out that Defendant made "incriminating statements" to Deputy Sherman—i.e., "What if that thing is mine?" and "I could lie and say 'It ain't mine' . . . [o]r I could say, 'Yes, it's mine' "—those statements merely establish that Defendant had knowledge of the existence of a weapon or weapons, not that he created either of the weapons later found in his possession. In the absence of any such evidence, we reject the State's unsupported contention that Defendant's possession of each weapon was separated in time, thereby allowing separate punishments based on separate acts. *See Chan v. Montoya*, 2011-NMCA-072, ¶ 9, 150 N.M. 44, 256 P.3d 987 (stating that "[t]he mere assertions and arguments of counsel are not evidence" (internal quotation marks and citation omitted)); *see also State v. Dominguez*, 2014-NMCA-064,

¶ 26, 327 P.3d 1092 ("[W]e will not search the record to find facts to support [an] argument.").

**{20}** With respect to space considerations, it bears emphasis that while the weapons were found in two different places in Defendant's bunk area—the razor weapon in the upper support beam above Defendant's sleeping area and the mop weapon inside Defendant's mattress—both were discovered near one another within Defendant's limited bunk space. That the weapons were secreted and found in separate hiding places each within an arm's-length of the other does not reflect possessory conduct sufficiently distinct in nature to support multiple punishments. *See Bernard*, 2015-NMCA-089, ¶ 27 (concluding that time and space considerations failed to establish the distinctness of the defendant's acts of possessing four stolen vehicles even where there was evidence that the defendant may have possessed certain vehicles at different times and in different locations). Indeed, the absence of distinct acts suggested by the weapons' proximity to one another is reflected in both the fact that they were found during the same search and that the discovery led to identical jury instructions with only the name of the weapon differing. *See Tidey*, 2018-NMCA-014, ¶ 13 (concluding that there was "an insignificant indicia of distinctness" supporting separate punishments where separate items of drug paraphernalia were "simultaneously found" and the jury received the same instruction as to both counts of possession); *Bernard*, 2015-NMCA-089, ¶ 27 (noting that the four stolen vehicles were recovered "from the same location" and that the jury "was not instructed to consider whether [the d]efendant possessed the vehicles at separate times and locations"). Thus, we agree with Defendant that, based on the evidence adduced at trial, the conduct underlying the two possession charges was the single act of possessing two different weapons at the same time, and that neither time nor space considerations support multiple punishments here.

**{21}** We next consider whether the objects and results involved in this case supply the necessary indicia of distinctness to allow the conclusion that the Legislature intended a prisoner in Defendant's position to be punished separately for each weapon possessed. *See Bernard*, 2015-NMCA-089, ¶ 26 ("If a case cannot be resolved from time and space considerations, then resort must be had to the quality and nature of the acts or to the objects and results involved." (internal quotation marks and citation omitted)). Turning first to the objects involved, the two makeshift weapons found to be in Defendant's possession, the razor weapon and the mop weapon, are more similar than different. The fact that one weapon was designed to inflict harm through slashing and the other designed to injure through stabbing does not provide the differentiation necessary to support separate convictions in this case. That is because our Legislature has defined "deadly weapon" as including, inter alia,

> *any weapon* which is capable of producing death or great bodily harm, including but not restricted to any types of daggers, brass knuckles, switchblade knives, bowie knives, poniards, butcher knives, dirk knives *and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted*, including swordcanes, and any kind of sharp pointed canes, also slingshots, slung shots, bludgeons[.]

NMSA 1978, § 30-1-12(B) (1963) (emphasis added). Indeed, rather than clarifying whether the Legislature intended separate punishment for possession of each individual weapon meeting the definition of "deadly weapon," the definition of "deadly weapon" only amplifies the lack of clarity regarding the intended unit of prosecution under Section 30-22-16. Because the razor weapon and the mop weapon each qualify as a "deadly weapon" as that term is defined in the Criminal Code, and there being no other reliable indicators of legislative intent, we conclude that the minor differences in functionality between the two prison-made weapons possessed by Defendant does not justify convicting him of separate counts under Section 30-22-16. *See Tidey*, 2018-NMCA-014, ¶ 15 (explaining that "[t]he Legislature specifically included a comprehensive list of defined items . . . that constitute drug paraphernalia" and noting that the items at issue in that case—empty baggies and a straw with a burnt end—both fell within the "containers and other objects used" category of drug paraphernalia (internal quotation marks and citation omitted)); *cf. Bernard*, 2015-NMCA-089, ¶¶ 28-31 (relying on various legislative enactments contained in both the Motor Vehicle Code and the Criminal Code in concluding that there existed sufficiently distinct indicia of "objects and results" to support multiple punishments).

{22}    Turning next to the results involved, the only "result" of Defendant's possession of the razor and mop weapons was the completed act of possession itself, a violation of Section 30-22-16. Indeed, this is neither a case in which a further consequence of possession of a deadly weapon by a prisoner materialized—e.g., where multiple deadly weapons simultaneously possessed are used to inflict multiple injuries on a victim or separate injuries on multiple victims—nor one in which the "results involved" bear the evidentiary capacity to supply the necessary indicia of distinctness to support multiple punishments under Section 30-22-16. *Cf. Bernal*, 2006-NMSC-050, ¶ 20 (concluding that indicia of distinctness supported separate punishment for two attempted robberies where "there were two victims, and most notably, each victim suffered separate and distinct harms at the hands of [the d]efendant"); *State v. Baca*, 1992-NMSC-055, ¶¶ 1-2, 114 N.M. 668, 845 P.2d 762 (involving a case where the prisoner used a "shank" or "crude jail-made knife" to kill another inmate and was convicted of both first degree murder and possession of a deadly weapon by a prisoner). That Defendant admitted to having feelings of "hate and anger" toward a particular inmate and wanting to "cut that guy's head off" at most supplies evidence of a *contemplated* and *potential* "result" of Defendant's possession. Fortuitously, however, no such result ever occurred thanks to the diligence of prison personnel. Thus, on the facts of this case, the "result" of Defendant's prohibited conduct—i.e., the completed act of possessing deadly weapons—also fails to establish sufficient indicia of distinctness to justify multiple punishments.

{23}    As a final matter, we briefly address the State's argument centering on the "policy considerations" underlying and the "interests protected" by Section 30-22-16, an argument the State advances as part of its "objects and results" discussion and one which reflects a misunderstanding of the focus of this aspect of a unit-of-prosecution analysis. The State argues that the statute evinces the Legislature's "clear and self-evident policy . . . to prohibit and minimize the availability of deadly weapons to

prisoners in a confined place of incarceration." According to the State, "the Legislature must have intended that there be as few deadly weapons as possible available to inmates."[2] With this much, we agree. *See Baca*, 1992-NMSC-055, ¶ 16 (describing a violation of Section 30-22-16 as "a crime closely approaching a strict liability crime" and noting that the purpose of the statute "is to protect inmates and officers from assaults with dangerous weapons perpetrated by armed prisoners"). However, the relevant inquiry does not involve a determination of the legislative purpose and intent in enacting the statute itself, but rather whether the Legislature intended for multiple punishments to be imposed under the specific facts of a given case. As previously discussed, we cannot say that that there are sufficient indicia of distinctness to support Defendant's separate convictions under Section 30-22-16. Applying the rule of lenity, we hold that Defendant's convictions for simultaneously possessing two deadly weapons violate his right to be free from double jeopardy. We, therefore, reverse with instructions to the district court to vacate one of Defendant's convictions.

**CONCLUSION**

**{24}**    We conclude that sufficient evidence supports Defendant's convictions under Section 30-22-16. However, because we hold that those convictions violate the prohibition against double jeopardy, we remand to the district court to vacate one of the convictions.

**{25}    IT IS SO ORDERED.**

**J. MILES HANISEE, Judge**

**WE CONCUR:**

**MEGAN P. DUFFY, Judge**

**BRIANNA H. ZAMORA, Judge**

---

2The State cites *Ramirez*, 2018-NMSC-003, ¶ 54, in support of this contention. Notably, however, *Ramirez's* discussion of "[p]olicy considerations" and what the Legislature "must have intended" informed our Supreme Court's interpretation of the statute there at issue under the first step of a unit-of-prosecution analysis, i.e., in resolving whether the statute was ambiguous as to the unit of prosecution, not under step two's "indicia of distinctness" analysis, which focuses on whether the unit of prosecution is discernible vis-à-vis the specific facts of the case.