# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMSC-027

Filing Date: May 20, 2021

No. S-1-SC-37613

**STATE OF NEW MEXICO,**

Plaintiff-Petitioner,

v.

**MILO BENALLY,**

Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**John A. Dean, Jr., District Judge**

Released for Publication August 31, 2021.

Hector H. Balderas, Attorney General
Walter M. Hart, III, Assistant Attorney General
Santa Fe, NM

for Petitioner

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Respondent

## OPINION

**VIGIL, Justice.**

**{1}** We granted certiorari to review whether Defendant Milo Benally's two convictions for "[p]ossession of deadly weapon or explosive by prisoner," NMSA 1978, § 30-22-16 (1986), violated his double jeopardy rights under the United States and New Mexico Constitutions. *State v. Benally*, 2019-NMCA-048, ¶¶ 23-24, 448 P.3d 592. More specifically, we are asked to consider "whether the [L]egislature intended" to punish Defendant for his "entire course of conduct" in possessing two deadly weapons while incarcerated, or "whether the [L]egislature intended" to punish Defendant separately "for each discrete act" or weapon possessed. *Swafford v. State*, 1991-NMSC-043, ¶ 8, 112

N.M. 3, 810 P.2d 1223. This case thus presents a question about the intended unit of prosecution under Section 30-22-16.

**{2}** The Court of Appeals held that Section 30-22-16 was ambiguous as to its intended unit of prosecution and that Defendant's conduct was not sufficiently distinct to support multiple punishments. *Benally,* 2019-NMCA-048, ¶¶ 13-23. We affirm the Court of Appeals and, like that court, *id.* ¶ 24, remand to the district court to vacate one of Defendant's convictions. Nevertheless, we write to reemphasize the relevant inquiry of our two-step framework for reviewing questions of double jeopardy in which a defendant has received multiple punishments for violation of the same statute, such as in the case presented here. *See Herron v. State,* 1991-NMSC-012, ¶ 12, 111 N.M. 357, 805 P.2d 624.

**{3}** We begin by reviewing the background and procedural posture of this appeal. Next, we set forth our standard of review and explain our two-step approach to analyzing cases presenting issues of double jeopardy in unit of prosecution convictions. We then analyze Defendant's two convictions for possession of a deadly weapon by a prisoner under Section 30-22-16 using this two-step framework. In the end, we affirm the Court of Appeals and remand to the district court to vacate one of Defendant's convictions as violative of his double jeopardy rights.

## I.     BACKGROUND

**{4}** The underlying facts of this case were well detailed by the Court of Appeals, and we incorporate that description here. *Benally,* 2019-NMCA-048, ¶¶ 2-5. We recite only those facts we deem helpful to our analysis.

**{5}** Following a "shakedown" search of Defendant's dormitory-style pod, prison staff found "two makeshift weapons" in Defendant's bunk. *Id.* ¶¶ 2-4. The first weapon was "a shaving razor with a playing card folded around it to form a handle." *Id.* ¶ 3. This "razor weapon" was found in the support bar of the bunk above Defendant's bed. *Id.* The second weapon was "a sharpened piece of the end of a plastic mop handle," which was found hidden inside Defendant's mattress. *Id.* Also inside the mattress was a locking ring from the same mop. In a nearby shower stall, prison staff found "orange plastic shavings that matched the end of a mop handle . . . and similar residue ground into the concrete lip of the shower pan." *Id.* ¶ 3. Finally, in a utility closet used to store cleaning supplies, prison staff found "that an end to one of the plastic mop handles had been removed." *Id.*

**{6}** Defendant later made incriminating statements during an interview with prison officials, expressing anger towards another inmate and insinuating that he knew prison staff had found weapons in the dormitory. *Id.* ¶ 4. However, Defendant did not fully admit to possessing the weapons, *id.*, and later testified that he had never seen the razor weapon, mop weapon, or mop locking ring prior to trial.

**{7}** The jury convicted Defendant of two counts of possession of a deadly weapon by a prisoner, contrary to Section 30-22-16. *Benally,* 2019-NMCA-048, ¶ 5. Defendant

received a nine-year sentence for each conviction, NMSA 1978, § 31-18-15(A)(7) (2007, amended 2019), and each sentence was enhanced by eight years because Defendant was a three-time habitual offender under NMSA 1978, § 31-18-17(C) (2003). In total, Defendant was sentenced to thirty-four years.

**{8}** Defendant sought reversal of his convictions on two grounds before the Court of Appeals. *Benally*, 2019-NMCA-048, ¶ 1. First, he asserted that his convictions were not supported by sufficient evidence because the State failed to show that Defendant possessed the two weapons. *Id.* ¶ 6. The Court of Appeals disagreed and found the evidence sufficient for the jury to infer Defendant's constructive possession. *Id*. ¶¶ 9-10, 12. We denied Defendant's petition for certiorari on the sufficiency of the evidence issue, and that issue is not before this Court.

**{9}** Second, and pertinent to our review, Defendant argued that his convictions violated his right under principles of double jeopardy to be free from multiple punishments for the same conduct under the same criminal statute. *Id.* ¶ 13. The Court of Appeals agreed and vacated one of Defendant's convictions as violative of his double jeopardy rights. *Id.* ¶ 23. The State appealed, challenging the Court of Appeals' conclusion that there were not "sufficient indicia of distinctness to support Defendant's separate convictions under Section 30-22-16," *id*., and arguing that "the Legislature intended . . . to permit a separate charge [and resultant punishment] for each deadly weapon found in possession of a prisoner." We granted certiorari only as to this double jeopardy issue.

## II.    STANDARD OF REVIEW

**{10}** "The Fifth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment Due Process Clause, and Article II, Section 15 of the New Mexico Constitution each protect defendants against multiple punishments for the same offense." *State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 38, 136 N.M. 309, 98 P.3d 699. However, "[i]n the multiple punishment context, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the [L]egislature intended." *Swafford,* 1991-NMSC-043, ¶ 7 (brackets omitted) (internal quotation marks and citation omitted). The issue, though constitutional, becomes "primarily one of legislative intent," because "[m]ultiple punishments run afoul of the double jeopardy clause only where the Legislature has not authorized multiple punishments." *State v. Ellenberger*, 1981-NMSC-056, ¶ 17, 96 N.M. 287, 629 P.2d 1216.

**{11}** We have identified two types of multiple punishment cases: "cases in which a defendant has been charged with multiple violations of a single statute based on a single course of conduct, known as unit of prosecution cases; and cases in which a defendant is charged with violations of multiple statutes for the same conduct, known as double-description cases." *State v. DeGraff,* 2006-NMSC-011, ¶ 25, 139 N.M. 211, 131 P.3d 61 (internal quotation marks and citation omitted). "While the analysis for each type of case focuses on whether the Legislature intended multiple punishments, the particular canons of construction we apply in ascertaining the Legislature's intent

depend on the specific type of multiple punishment case in front of us." *Alvarez-Lopez*, 2004-NMSC-030, ¶ 38 (citation omitted). This is a unit of prosecution case where "the relevant inquiry . . . is whether the [L]egislature intended punishment for the entire course of conduct or for each discrete act." *Swafford*, 1991-NMSC-043, ¶ 8. We review this question de novo. *State v. Olsson*, 2014-NMSC-012, ¶ 14, 324 P.3d 1230.

## III. DISCUSSION

### A. Two-Step Analytical Framework for Unit of Prosecution Cases

{12} We have previously articulated a two-step framework for analyzing questions about the intended unit of prosecution of a criminal statute. *Herron*, 1991-NMSC-012, ¶¶ 6, 15. Throughout both steps of our unit of prosecution analysis, our focus remains on whether a defendant has received more punishments than the number of punishments that the Legislature intended to authorize under the facts and circumstances of the case. *See Swafford*, 1991-NMSC-043, ¶ 7.

{13} Under the first step of our framework, we "must analyze the statute to determine whether the Legislature has defined the unit of prosecution and, if the statute spells out the unit of prosecution, then the court follows that language and the inquiry is complete." *Olsson*, 2014-NMSC-012, ¶ 18. The purpose of this first step is to ascertain the legislative intent as to the unit of prosecution or, in other words, to determine what conduct the Legislature "has defined [as] a statutory offense" or "[w]hether a particular course of conduct involves one or more distinct *offenses* under the statute." *Sanabria v. United States*, 437 U.S. 54, 69-70 (1978). Our prior caselaw makes clear that we should consider all markers of legislative intent in construing the unit of prosecution defined by a criminal statute, including the wording, structure, legislative history, legislative purpose, and quantum of punishment prescribed under the statutory scheme. *State v. Swick*, 2012-NMSC-018, ¶ 33; 279 P.3d 747; *State v. Gallegos*, 2011-NMSC-027, ¶¶ 32-33, 149 N.M. 704, 254 P.3d 655; *Olsson*, 2014-NMSC-012, ¶¶ 23-30; *DeGraff*, 2006-NMSC-011, ¶¶ 32-34. We note, however, that some of our unit of prosecution precedents may have not explicitly discussed all potentially relevant canons of statutory construction. *See, e.g., State v. Bernal*, 2006-NMSC-050, ¶ 14, 140 N.M. 644, 146 P.3d 289 ("If the statutory language spells out the unit of prosecution, then we follow the language, and the unit-of-prosecution inquiry is complete. If the language is not clear, then we move to the second step." (citation omitted)); *see also State v. Torres,* 2021-NMCA-045, ¶ 9, 495 P.3d 1141 (explaining that the "fundamental task" in a unit of prosecution analysis is to "look[] for a clear expression that the Legislature intended to allow multiple punishments for a single act or transaction" but acknowledging that "our courts often go no further than evaluating the plain language of the statute"), *cert. granted*, S-1-SC-38484 (Nov. 9, 2020). We thus reaffirm that our analysis remains focused on construing the legislatively intended unit of prosecution, and we emphasize the proper role of all relevant canons of statutory construction in ascertaining that intent.

{14} After consideration of these markers of legislative intent, if we are able to decipher the Legislature's intended unit of prosecution, then our inquiry is complete. *See Olsson*, 2014-NMSC-012, ¶ 18. However, if the statute remains "insurmountably

ambiguous" as to its intended unit of prosecution, then we apply yet another canon of construction—the rule of lenity—and construe the statute in favor of the defendant. *See id.* ¶¶ 43-45. Under the rule of lenity, we presume that the Legislature did not intend to split a defendant's single course of conduct into separately punishable acts. *Cf. Swafford*, 1991-NMSC-043, ¶ 8 (describing rule of lenity as a "presumption of lenity that, absent an express indication to the contrary, the legislature did not intend to fragment a course of conduct into separate offenses"); *Bell v. United States,* 349 U.S. 81, 83-84 (1955) (explaining that the rule of lenity "means that if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses").

{15}   We emphasize that the statute must be found to be "insurmountably ambiguous" as to its intended unit of prosecution before resorting to the rule of lenity. *Olsson,* 2014-NMSC-012, ¶ 45. As we stated previously,

> . . . The rule of lenity counsels that criminal statutes should be interpreted in the defendant's favor when insurmountable ambiguity persists regarding the intended scope of a criminal statute.
>
>         There are limits, however, to the rules of lenity and strict construction. A criminal statute is not ambiguous for purposes of lenity merely because it is *possible* to articulate a construction more narrow than that urged by the Government. Nor does a division of judicial authority regarding the proper construction of a particular statute automatically trigger lenity. Rather, lenity is reserved for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute.

*State v. Ogden*, 1994-NMSC-029, ¶¶ 25-26, 118 N.M. 234, 880 P.2d 845 (brackets omitted) (internal quotation marks and citations omitted). Thus, we will construe a statute in favor of a defendant only when "a reasonable doubt persists about a statute's intended" unit of prosecution "even *after* resort" to the statute's wording, structure, legislative history, legislative purpose, and the quantum of punishment prescribed. *Id*. (internal quotation marks and citation omitted).

{16}   The rule of lenity requires us to presume that the Legislature did not intend to separately punish discrete acts in a defendant's course of conduct "absent proof that each act . . . [was] in some sense distinct from the others." *Herron*, 1991-NMSC-012, ¶ 15. After applying the rule of lenity to our interpretation of the statute's unit of prosecution, we then turn to the second step of our analysis in which we consider "whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments." *Olsson,* 2014-NMSC-012, ¶ 18 (internal quotation marks and citation omitted).

{17}   "Under the second step of the unit-of-prosecution analysis, we 'determine whether a defendant's acts are separated by sufficient indicia of distinctness to justify

multiple punishments under the same statute.'" *State v. Ramirez*, 2018-NMSC-003, ¶ 56, 409 P.3d 902 (quoting *Bernal*, 2006-NMSC-050, ¶ 14). Determining unit of prosecution by analyzing indicia of distinctness again "amounts to a canon of construction" that guides our interpretation of the statutory text. *State v. Morro*, 1999-NMCA-118, ¶ 11, 127 N.M. 763, 987 P.2d 420. If a defendant's acts "constitute[] 'separate offenses under the statute, we will presume that to be the legislative intent, until the Legislature amends the statute to indicate otherwise.'" *Ramirez*, 2018-NMSC-003, ¶ 56 (quoting *Morro*, 1999-NMCA-118, ¶ 11). "Thus, if the defendant commits 'discrete acts violative of the same statutory offense, but separated by sufficient indicia of distinctness, then a court may impose separate, consecutive punishments for each offense.'" *State v. Barr*, 1999-NMCA-081, ¶ 15, 127 N.M. 504, 984 P.2d 185 (quoting *Swafford*, 1991-NMSC-043, ¶ 26).

**{18}** We emphasize that our analysis of indicia of distinctness is, like our analysis under the first step, "guided by the statute at issue, including its language, history, and purpose, as well as the quantum of punishment that is prescribed." *Gallegos*, 2011-NMSC-027, ¶ 33. While we agree with the Court of Appeals that "the relevant inquiry" of the second step of the framework is "whether the Legislature intended for multiple punishments to be imposed under the specific facts of a given case," *Benally,* 2019-NMCA-048, ¶ 23, we clarify that the legislative purpose and intent in enacting the statute is controlling to this analysis. *Cf. Bernal,* 2006-NMSC-050, ¶ 14 ("In examining the indicia of distinctness, courts may inquire as to the interests protected by the criminal statute, since the ultimate goal is to determine whether the legislature intended multiple punishments."). This is because our focus under this second step is whether a defendant's acts can be distinguished as discrete violations of the conduct the Legislature intended to proscribe. *Cf. Herron*, 1991-NMSC-012, ¶ 15 (identifying relevant indicia of distinctness by considering the factors courts have found dispositive in distinguishing the relevant criminal acts); *State v. Frazier*, 2007-NMSC-032, ¶¶ 66-68 n.4, 142 N.M. 120, 164 P.3d 1 (Chávez, J., specially concurring) ("[W]hether the conduct underlying each charged offense—even if [each violates] the same statute, and thus [the multiple charges constitute] a unit-of-prosecution case—is part of the 'same act or transaction' depends upon what conduct the Legislature intended to proscribe—not simply upon the temporal or spatial separation between the defendant's discrete actions.").

**{19}** In *Herron*, we articulated six indicia that a court may consider when analyzing whether a defendant's acts are sufficiently distinct so as to support separate punishments under the same statute: (1) time between criminal acts, (2) location of the victim during each act, (3) existence of any intervening events, (4) sequence in commission of the acts, (5) the defendant's intent, and (6) the number of victims. 1991-NMSC-012, ¶ 15. However, we did not attempt to "lay[] out a mechanical formula" for evaluating indicia of distinctness in all circumstances and "sought instead to provide 'general principles' to aid in the analysis." *Bernal*, 2006-NMSC-050, ¶ 16 (citation omitted). Thus, the six *Herron* indicia serve as a "general policy" for examining distinctness, but in undertaking this analysis courts should "examine the elements of the offense and any policy underlying the specific statute." *Morro*, 1999-NMCA-118, ¶ 12.

**{20}** For example, in *Gallegos*, we explained that the Legislature intended the crime of conspiracy to punish the agreement among coconspirators "to achieve illegal objectives" rather than punish the discrete objectives of that agreement. 2011-NMSC-027, ¶¶ 60-62. Accordingly, we held that an individual defendant's extended course of conduct in pursuit of an agreement to kill the victim constituted a singular violation of the conspiracy statute for which the defendant could be punished. *See id.* ¶¶ 62-64 ("We are persuaded that this is the type of routine case on which the Legislature clearly intended to impose one punishment."). In *Bernal*, 2006-NMSC-050, ¶ 28, we explained that "[s]ince the robbery statute [was] designed to protect citizens from violence," it was then "logical that the legislature intended to allow for separate charges for each individual against whom violence or the threat of violence is separately used." And in *Morro*, 1999-NMCA-118, ¶ 19, the Court of Appeals reasoned that the individual and societal interests protected by the Legislature's prohibition against defacing tombs—that "injury to each gravestone causes injury to the memory of a different [decedent] and is likely to cause emotional distress to a different collection of living persons"—authorized punishments against a defendant for each tomb he defaced.

**{21}** As such, while the *Herron* indicia provide a general approach for testing distinctness, our inquiry is always guided by legislative intent. Thus, in *Olsson* we concluded that the *Herron* indicia were not relevant to possession of child pornography "where a defendant [did not have] direct contact with a victim." *Olsson*, 2014-NMSC-012, ¶ 39. We noted that "[p]ossession cases do not so neatly fit the *Herron* mold because it is unclear when each of the factors would apply and the factors are inconclusive when they do apply" to that offense. *Id.* However, the factual record was not sufficiently developed for one of the *Olsson* defendants, *id.* ¶ 33, and the Court could not discern what other indicia might have applied to the second defendant under the language and purpose of the relevant statute. *Id.* ¶¶ 34-42. Accordingly, the *Olsson* Court held "that the *Herron* factors are not applicable in possession cases and that the indicia of distinctness factors do not determine the unit of prosecution." *Id.* ¶ 42.

**{22}** For possession cases, other statutes and factual circumstances may supply the guidance that is lacking in *Olsson*. *Cf. State v. Bernard*, 2015-NMCA-089, ¶¶ 25-26, 355 P.3d 831 ("[W]e do not believe that *Olsson*'s abandonment of *Herron*[] . . . requires a wholesale departure from an indicia of distinctness analysis if the facts of a unit of prosecution case render such analysis practicable."). For example, our lower courts have subsequently considered whether a defendant's possessory acts were "sufficiently separated by either time or space" or whether the "quality and nature of the acts or . . . the objects and results involved" would support an inference that those acts were distinct. *Bernard*, 2015-NMCA-089, ¶¶ 25-26 (internal quotation marks omitted) (quoting *Swafford*, 1991-NMSC-043, ¶ 28); *see also State v. Tidey*, 2018-NMCA-014, ¶ 11, 409 P.3d 1019 (describing indicia of distinctness in a case where a defendant was charged with multiple counts of possession of drug paraphernalia). We agree that, as a general proposition, distinctions in time, space, quality and nature of the acts, or the objectives and results involved may indicate that a defendant's possessory acts would support multiple punishments. Nevertheless, we once again emphasize that the distinctness inquiry should be guided by legislative intent and the facts and circumstances of the case. *Cf. Bernal*, 2006-NMSC-050, ¶ 16 ("In each case, we attempt to determine, based

upon the specific facts of each case, whether a defendant's activity is better characterized as one unitary act, or multiple, distinct acts, consistent with legislative intent."). And the issue may, in some circumstances, involve factual questions appropriate for a jury. *Cf. Herron*, 1991-NMSC-012, ¶ 16 ("[W]e are cognizant that, when reasonable minds may differ, the question of what constitutes a separate and distinct offense . . . may well reside with the jury.").

**{23}** Finally, if we can reasonably infer that a defendant's acts were distinct under the applicable indicia of distinctness, then we will presume that the defendant has not received more punishments than were statutorily authorized. *See id.* ¶ 21. If a defendant's acts are not sufficiently distinct, then we will return to our lenient construction of the statute and presume that the defendant has received more punishments than were statutorily authorized. *See id*. Accordingly, we will vacate excess convictions as violative of the defendant's double jeopardy rights. *Id*. ¶¶ 1, 22.

## B.     Analysis of the Unit of Prosecution of Section 30-22-16

**{24}** In light of the foregoing, we now detail our review of Defendant's multiple convictions for possession of a deadly weapon by a prisoner under Section 30-22-16.

### 1.     First step: interpretation of the statutory text

**{25}** To discern the Legislature's intent, we begin our analysis with the plain language of Section 30-22-16. *Olsson*, 2014-NMSC-012, ¶ 18 ("The plain language of the statute is the primary indicator of legislative intent."). Section 30-22-16 provides, "Possession of deadly weapon or explosive by prisoner in lawful custody consists of any inmate . . . possessing any deadly weapon or explosive substance. Whoever commits possession of deadly weapon or explosive by prisoner is guilty of a second degree felony." We read this in conjunction with NMSA 1978, Section 30-1-12(B) (1963), which defines "deadly weapon" to include "any weapon which is capable of producing death or great bodily harm, including but not restricted to any types of daggers . . . and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted."

**{26}** The State, Defendant, and Court of Appeals all agreed that the plain language of Section 30-22-16 is ambiguous as to its intended unit of prosecution. *Benally*, 2019-NMCA-048, ¶ 16. We similarly agree that the statute's relevant phrase, "possessing any deadly weapon," is ambiguous, as the stated unit of "any" could indicate an intent to punish a prisoner separately for each weapon possessed or once for a class of weapons possessed. *Cf. Ramirez,* 2018-NMSC-003, ¶ 53 (explaining that the definite article "a" in the child abuse statute indicated that the Legislature intended the unit of prosecution as one child and noting that "the phrase 'any child' . . . would have expressly contemplated that more than one child may be affected by a single course of abuse"); *Olsson*, 2014-NMSC-012, ¶ 21 ("[T]he use of the word 'any' in the statute only compounds the ambiguity."); *DeGraff*, 2006-NMSC-011, ¶ 33 ("[W]e are not persuaded that the statute's use of the word 'any' shows the Legislature's intent to permit only a single conviction for all tampering with a single crime scene."). The shifting grammatical inflection in Section 30-1-12(B) defining the term "deadly weapon" adds to this

ambiguity, as the term is referred to as both a singular object ("any weapon which is") and as a class ("and all such weapons with which").

**{27}** We thus agree that the wording and structure of the statute is ambiguous as to its intended unit of prosecution. However, as we seek to ascertain the Legislature's intent, we do not confine our analysis to the language of the statute, as the Court of Appeals did below, but also consider Section 30-22-16's legislative history, purpose, and the quantum of punishment prescribed. Unfortunately, however, our analysis of these factors provides little clarity as to the intended unit of prosecution of Section 30-22-16.

**{28}** We turn to the legislative history of the statute. The relevant language of Section 30-22-16 has remained unchanged since its enactment in 1963. *Compare* 1963 N.M. Laws, ch. 303, § 22-15, *with* 1986 N.M. Laws, ch. 4, § 1. The 1986 amendment made the offense a second-degree felony, where it had previously been a third-degree felony; but the definitional clause of the statute has not been amended. *Id.* Thus, the history of the enactment does not reveal its intended unit of prosecution.

**{29}** The legislative purpose behind Section 30-22-16 does not resolve this ambiguity. We have explained that Section 30-22-16 describes "a crime closely approaching a strict liability crime" and noted generally that "[t]he purpose of [possession of a deadly weapon by a prisoner] is to protect inmates and officers from assaults with dangerous weapons perpetrated by armed prisoners." *State v. Baca*, 1992-NMSC-055, ¶ 16, 114 N.M. 668, 845 P.2d 762 (internal quotation marks and citation omitted). The State argues that Section 30-22-16 must be interpreted to permit multiple punishments to effectuate this purpose, as it reasons that the goal of the statute "is to *minimize* the number of deadly weapons" in a prison facility. For example, the State posits that limiting Section 30-22-16 to authorize only one punishment would encourage a group of prisoners to stockpile weapons with a single inmate, knowing that, if their weapons cache were to be discovered, the inmate deemed to have possession could only be convicted of one offense. The State thus urges us to conclude that the intended unit of prosecution under Section 30-22-16 is for each deadly weapon possessed.

**{30}** We agree that one goal of the statute is to minimize the availability of weapons in a prison facility. Yet we do not agree that this goal establishes the intended unit of prosecution of Section 30-22-16. For example, the State's argument assumes that the Legislature was specifically concerned about a single prisoner's accumulation of deadly weapons; but there is no indication that such hoarding was of particular concern. Indeed, nothing presented suggests that the Legislature was more concerned about a single prisoner's accumulation of multiple weapons than it was concerned about other possible scenarios, such as multiple prisoners possessing their own weapons individually. The legislative purpose thus does not clarify the intended unit of prosecution.

**{31}** The quantum of punishment prescribed by Section 30-22-16 is likewise inconclusive. Defendant argues, for example, that the Legislature's decision to classify Section 30-22-16 as a second-degree felony carrying a nine-year sentence shows that a single conviction would sufficiently deter a prisoner from possessing multiple deadly

weapons. We note also that many defendants charged with possession of deadly weapon by prisoner may qualify as habitual offenders under Section 31-18-17. Under that statute, a basic sentence for a noncapital felony is increased by one year, four years, or eight years, depending on the number of prior felonies on a defendant's criminal record. *See* § 31-18-17(A)-(C) (requiring a one-year enhancement for one prior felony, a four-year enhancement for two prior felonies, and an eight-year enhancement for three or more prior felonies). This means that, in practice, many defendants convicted under Section 30-22-16 may receive at least a ten-year sentence. The imposition of such a severe punishment might suggest that the Legislature did not intend for each deadly weapon to constitute its own unit of prosecution.

**{32}** We also contrast the quantum of punishment for a prisoner's possession of deadly weapon, a second-degree felony which carries a basic sentence of nine years, § 31-18-15(A)(7), with offenses that might result from a prisoner's use of a deadly weapon. For example, the offenses of assault by a prisoner, NMSA 1978, § 30-22-17 (1963), aggravated assault upon a peace officer with a deadly weapon, NMSA 1978, § 30-22-22 (1971), aggravated battery, NMSA 1978, § 30-3-5 (1969), and aggravated battery upon a peace officer with a deadly weapon, NMSA 1978, § 30-22-25 (1971), are all third-degree felonies which carry a sentence of three years, § 31-18-15(A)(11). This demonstrates that, in some instances, the punishment for the *possession* of a deadly weapon by a prisoner is three times the punishment for *use* of a deadly weapon to cause apprehension or great bodily harm. *Compare* § 31-18-15(A)(7) (requiring nine years imprisonment for second-degree felonies) *with* § 31-18-15(A)(11) (requiring three years imprisonment for third-degree felonies).

**{33}** Even in circumstances where a prisoner's use of deadly weapons might constitute a more serious offense than a third-degree felony, the mere possession of two deadly weapons may result in harsher punishment. As an illustration, if Defendant had intended to kill another person and used one or both of his makeshift weapons to severely injure that person, then he could have been charged with the second-degree felony of attempted first-degree murder. NMSA 1978, § 30-2-1(A) (1994); § 30-28-1(A) (1963). If convicted of that crime, Defendant would face nine years imprisonment, § 31-18-15(A)(7), and his sentence would likely be enhanced by eight years due to his habitual offender status, § 31-18-17(C). His total sentence for using the deadly weapons in an attempted murder would be seventeen years. Fortunately, Defendant did not harm anyone in this case. But, Defendant's sentence of thirty-four years for possession of two deadly weapons is twice the length that his sentence might have been for gravely injuring another with those weapons. This disparity between conduct and sentencing suggests that the Legislature did not intend to prosecute a prisoner for each weapon possessed. *Cf. Olsson*, 2014-NMSC-012, ¶ 30 (comparing the defendants' stacked sentences for multiple counts of possession of child pornography with the basic sentence for the related offense of criminal sexual contact with a minor to conclude that the Legislature could not have intended to permit separate punishment for possession of each pornographic image charged to the defendants).

**{34}** Nevertheless, we acknowledge, as the State asserts, that the severity of punishment under Section 30-22-16 may simply reflect the gravity of the offense. After

all, the Legislature's 1986 amendment increased the penalty for possession of a deadly weapon by a prisoner from three years imprisonment for the third-degree felony to nine years imprisonment for the second-degree felony. *Compare* 1963 N.M. Laws, ch. 303, § 22-15, *with* 1986 N.M. Laws, ch. 4, § 1; *see* § 31-18-15(A)(7), (11). We likewise note that a prisoner punished for the use of a deadly weapon may be also punished for the weapon's possession. *Cf. Baca*, 1992-NMSC-055, ¶ 2 (affirming a defendant's convictions for first-degree murder and possession of deadly weapon by prisoner after the defendant used a knife to kill another inmate). Thus, the above comparison demonstrating the sentencing disparities between possession and use is not conclusive as to legislative intent.

**{35}** In sum, we cannot decipher the unit of prosecution the Legislature intended under Section 30-22-16. The wording and structure of the statute is facially ambiguous, and that ambiguity is not resolved through consideration of the statute's history, purpose, or the quantum of punishment prescribed. The State's and Defendant's "equally valid ways of thinking about the unit of prosecution" demonstrate that Section 30-22-16 is insurmountably ambiguous in this respect. *Ramirez*, 2018-NMSC-003, ¶ 55.

**{36}** As we still have reasonable doubts about the intended unit of prosecution under Section 30-22-16, the rule of lenity counsels that we construe this statute in Defendant's favor. *See Swafford*, 1991-NMSC-043, ¶ 8. As such, we will presume that the Legislature did not intend to punish Defendant separately for each weapon possessed, unless his possession of each weapon could in some way be considered distinct. *Herron*, 1991-NMSC-012, ¶ 15.

### 2. Second step: analysis of the indicia of distinctness

**{37}** Accordingly, we next consider whether sufficient indicia of distinctness exist between Defendant's possession of each weapon under Section 30-22-16. The Court of Appeals considered whether Defendant's possession of each weapon could be distinguished by reviewing the evidence of (1) the relative timing of Defendant's gaining possession of the two weapons, (2) the spacing between locations of the weapons Defendant possessed, (3) the qualities or nature of the weapons themselves, and (4) the results of Defendant's conduct. *Benally*, 2019-NMCA-048, ¶¶ 18-22. Following this analysis, the Court of Appeals concluded that the indicia of distinctness were not sufficient to support Defendant's separate convictions. *Id.* ¶ 23. We agree with the Court of Appeals' conclusion, although we emphasize that our analysis is controlled by legislative intent.

**{38}** First, we agree that the timing of Defendant's possession of each weapon may be an appropriate indicium under the circumstances and the language of Section 30-22-16. However, no evidence suggested that Defendant came into possession of the weapons at different times. *Benally*, 2019-NMCA-048, ¶ 19. The State posits that the discovery in the nearby pod shower of orange shavings matching the mop weapon, as well as Defendant's possession of the mop locking ring, suggest that Defendant recently manufactured the mop weapon. As such, the State argues that this Court should infer that Defendant acquired the two weapons at different times. The State's theory as to

Defendant's acquisition of the two weapons is speculative, however, as the State does not cite any evidence that shows either how or when Defendant acquired each weapon. *See State v. Slade*, 2014-NMCA-088, ¶ 14, 331 P.3d 930 ("[E]vidence from which a proposition can be derived only by speculation among equally plausible alternatives is not substantial evidence of the proposition." (internal quotation marks and citation omitted)). The Court of Appeals recognized this and therefore "reject[ed] the State's unsupported contention that Defendant's possession of each weapon was separated in time" from the other. *Benally*, 2019-NMCA-048, ¶ 19.

**{39}**    As to considerations about the space between the weapons, we agree with the Court of Appeals that, although the weapons were found in different places in Defendant's bunk area, each was "within an arm's-length of the other," and both "were found during the same search." *Id.* ¶ 20. This indicium also does not distinguish Defendant's conduct.

**{40}**    We similarly agree that the two weapons—the sharpened mop handle and razor weapon—were by nature "more similar than different." *Id.* ¶ 21. Under Section 30-1-12(B), both weapons fit the definition of "deadly weapon" and had a similar functionality as being weapons "with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted." *See Benally*, 2019-NMCA-048, ¶ 21. We thus agree with the Court of Appeals that "the minor differences in functionality between the two prison-made weapons possessed by Defendant does not justify convicting him of separate counts under Section 30-22-16." *Id*.

**{41}**    As for the results of Defendant's crime, the Court of Appeals concluded that "the only 'result' of Defendant's possession of the razor and mop weapons was the completed act of possession itself." *Id.*¶ 22. The State argues, however, that the result of Defendant's criminal conduct went beyond mere possession; that the result of Defendant's possession was a decrease in the safety of prison inmates and staff. The State reasons that every weapon in a prison facility somehow increases the risk of harm in that facility, and thus the State insists that the possession of "each additional weapon" should itself be considered a distinct offense.

**{42}**    We again emphasize that legislative intent controls our inquiry under the indicia of distinctness analysis. *Gallegos*, 2011-NMSC-027, ¶ 33. Considering the legislative purpose of Section 30-22-16—to protect prison inmates and staff from the danger of assaults by armed prisoners, *Baca,* 1992-NMSC-055, ¶ 16—we agree that the Legislature may have intended to authorize multiple punishments when a defendant's possession of a deadly weapon had either the objective or result of a distinct decrease in prison safety. We can imagine that an inmate who is armed with multiple deadly weapons could, in some circumstances, pose a distinctly greater threat to prison safety than that same inmate armed only with a single weapon. For example, the State's hypothetical stockpiling inmate may pose a greater threat because that inmate may have wielded those multiple weapons at the same time or have planned to distribute those weapons to others for use in a riot. In these scenarios, either the objectives or the results of the inmate's possessory offenses may be sufficiently distinct, depending upon

the facts and circumstances of the case, and the Legislature may very well have intended to authorize multiple punishments under Section 30-22-16.

**{43}** However, we cannot say that this indicium adequately distinguishes Defendant's conduct here. This is not a case of the hypothetical dual-wielding or stockpiling defendant. We cannot reasonably infer that Defendant's constructive possession of the two weapons in his bunk area was more dangerous than his constructive possession of only one of these weapons. Rather, the threat posed by the two makeshift weapons found in Defendant's bunk was never actualized, and, as such, any resultant decrease in safety is too amorphous and abstract to sufficiently distinguish Defendant's conduct as two discrete violations of Section 30-22-16. Although there may be circumstances where the resultant or intended decrease in prison safety may support an inference that a prisoner's possessory acts are in some sense distinct, those circumstances are not presented here.

**{44}** In summary, we agree with the Court of Appeals that Defendant's two convictions were not supported by sufficient indicia of distinctness. *See Benally,* 2019-NMCA-048, ¶ 23. The weapons in Defendant's possession were similar in nature, and the evidence does not clearly establish that Defendant came into possession of the weapons at different times or that he possessed them in different spaces. And we do not see any distinction in objectives or results, including any appreciable decrease in prison safety, under the circumstances of this case.

**{45}** Despite reaching the correct result, the Court of Appeals' opinion seems to suggest that the Legislature's purpose in enacting the statute was not relevant to the indicia of distinctness analysis. *See id.* We thus emphasize that this legislative purpose controls our inquiry into whether Defendant's possessory acts were sufficiently distinct such that he may receive multiple punishments under Section 30-22-16.

## IV. CONCLUSION

**{46}** We emphasize the primacy of ascertaining legislative intent under both steps of the unit of prosecution analysis. We likewise emphasize the importance of considering the history, purpose, and quantum of punishment prescribed by a criminal statute, in addition to the statutory text.

**{47}** In the case at hand, we were unable to ascertain the intended unit of prosecution under Section 30-22-16 after consideration of these canons of statutory construction. We therefore resort to the rule of lenity and conclude that the Legislature did not intend to fragment Defendant's possession of two deadly weapons into two separate acts, absent some indication that each act of possession was in some sense distinct. The record does not support a reasonable inference of distinctness, and we cannot presume that the Legislature would have intended to punish Defendant for each weapon he possessed under the circumstances of the case.

**{48}** As such, we hold that Defendant has received one more punishment than was statutorily authorized under Section 30-22-16, in violation of his double jeopardy rights

under the United States and New Mexico Constitutions. We therefore affirm the Court of Appeals and remand to the district court, with instructions to vacate one of Defendant's convictions and accordingly adjust his sentence.

**{49}  IT IS SO ORDERED.**

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Chief Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**