The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:_____

Filing Date: October 3, 2022

**NO. S-1-SC-38484**

**STATE OF NEW MEXICO,**

Plaintiff-Petitioner,

v.

**GERARDO TORRES,**

Defendant-Respondent,

and

**STATE OF NEW MEXICO,**

Plaintiff-Petitioner,

v.

**KENDALE HENDRIX,**

Defendant-Respondent,

**CONSOLIDATED WITH**

**NO. S-1-SC-38546**

**STATE OF NEW MEXICO,**

Plaintiff-Petitioner,

v.

**SKEETER W. CHADWICK,**

Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Steven Blankinship, District Judge**

Hector H. Balderas, Attorney General
Benjamin L. Lammons, Assistant Attorney General
Santa Fe, NM

for Petitioner

Bennett J. Baur, Chief Public Defender
Victor E. Sanchez, Jr., Assistant Appellate Defender
Caitlin C.M. Smith, Associate Appellate Defender
Santa Fe, NM

for Respondents Gerardo Torres and Kendale Hendrix

Gary C. Mitchell, P.C.
Gary C. Mitchell
Ruidoso, NM

for Respondent Skeeter W. Chadwick

**OPINION**

**THOMSON, Justice.**

**I.      INTRODUCTION**

{1}      In this consolidated matter, Defendants Gerardo Torres, Kendale Hendrix, and Skeeter Chadwick challenge their indictments under double-jeopardy principles, standing accused of stealing several head of cattle from ranches in Otero County. The State charged each Defendant with one count of livestock larceny per animal allegedly stolen, resulting in multiple-count criminal informations. Prior to trial, Defendants filed motions to merge or dismiss the multiple charges, asserting that they instead may only be prosecuted for each episode of theft. The Twelfth Judicial District Court agreed with Defendants and dismissed the charges that it determined to be multiplicitous. On interlocutory appeals by the State, the Court of Appeals affirmed the orders of the district court in all three cases. *State v. Torres*, 2021-NMCA-045, ¶ 29, 495 P.3d 1141 (affirming in both *Torres* and *Hendrix*); *State v. Chadwick*, A-1-CA-38561, mem. op. ¶ 5 (N.M. Ct. App., Sept. 30, 2020) (nonprecedential). The State petitioned for certiorari, and we granted review and consolidated the appeals.

{2}      We affirm the Court of Appeals conclusion that the livestock larceny statute, NMSA 1978, § 30-16-1(G) (2006), does not express an intent to prosecute

Defendants for an alleged larceny of each animal. *Torres*, 2021-NMCA-045, ¶ 21. However, we reach this result through a different path and write to explain our reasoning. In particular, we rely on the two-step analysis developed by this Court in *Herron v. State*, 1991-NMSC-012, ¶¶ 6, 15, 111 N.M. 357, 805 P.2d 624, which provides framework for construing the unit of prosecution of a statute applied to multiple counts charged against a defendant. Using *Herron*, we ascertain that the Legislature has not expressed an intent to authorize multiple punishments for livestock larceny, § 30-16-1(G), based on the theft of multiple animals. We construe the statute as instead expressing an intent to prosecute Defendants for each episode of theft. We remand for further proceedings.

## II.    BACKGROUND

{3}    Because each Defendant challenged the multiple counts of livestock larceny in his indictment prior to conviction as violative of the Double Jeopardy Clause, we consider whether the indictment of each was multiplicitous, which is "the charging of a single offense in several counts." *State v. Lente*, 2019-NMSC-020, ¶ 25, 453 P.3d 416 (internal quotation marks and citation omitted); *see Herron*, 1991-NMSC-012, ¶ 6 n.4 ("We use the term 'multiplicity' to describe the situation when an indictment charges a single offense in different counts."). Our analysis draws factual background from affidavits and grand jury testimony supporting each indictment.

## A.    Factual Background

{4}    In July 2017, an operations manager at Crossroads Cattle Company's ranch in Otero County was branding calves in the ranch's Wimberly pasture. The operations manager noticed a significant discrepancy between the number of calves expected in the pasture and the number of calves branded. Suspicions arose that some calves had been stolen because the pasture was remote and situated in such a way as to make cattle easily amenable to undetected theft. Another ranch hand later informed the operations manager that he had helped Defendant Torres round up calves from the pasture and may have unwittingly assisted in the theft. Defendant Torres later confessed to stealing thirteen head of cattle from the ranch. Records from a Texas livestock auction house showed that Defendant Torres sold eighteen calves at the auction house on two occasions, in January 2017 and March 2017. The State charged Defendant Torres with eighteen counts of livestock larceny, one for each animal.

{5}    In a factually unrelated incident, Defendants Hendrix and Chadwick allegedly rustled twenty-five unbranded calves from Defendant Chadwick's employer, the Ganada Cattle Company. The theft was discovered in August 2018 when an off-duty livestock inspector observed Defendant Hendrix's truck hauling cattle near Carlsbad. The inspector recognized a distinctive mark on the side of the truck and observed two occupants, later identified as Defendants Hendrix and Chadwick. The

inspector was suspicious that the cattle had been stolen because they had not been inspected prior to shipment, as required by law. *See* NMSA 1978, § 77-9-30 (1999). The inspector contacted an area supervisor from the New Mexico Livestock Board and reported the suspected theft.

{6} The Livestock Board investigator determined that Defendants were probably hauling the cattle to an auction house near San Angelo, Texas. The area supervisor alerted Texas Rangers to a possible theft, and the Rangers confiscated twenty-four calves from Defendants Chadwick and Hendrix upon their arrival at the auction house. Another calf was too ill to be unloaded from the trailer. This calf was later euthanized, and Defendant Hendrix disposed of its carcass. The Livestock Board area supervisor confirmed that all twenty-five calves had been stolen from the Ganada ranch and that the calves were taken from a herd that had been quarantined to prevent the spread of a livestock disease. The State charged Defendants Chadwick and Hendrix with twenty-five counts of livestock larceny, one count for each head.

**B.     Procedural History**

{7} Prior to trial, each of the three Defendants filed motions to merge the multiple livestock larceny charges in their respective cases, arguing that their charges should be merged under the common-law single-larceny doctrine or double-jeopardy principles. The Twelfth Judicial District Court granted each of these motions,

4

reducing Defendant Torres's eighteen livestock larceny charges to two counts and Defendant Chadwick's and Defendant Hendrix's twenty-five livestock larceny charges each to one count each.

{8}     On appeal, the Court of Appeals affirmed the district court's orders in the proceedings against Defendant Torres and Defendant Hendrix, also concluding that these Defendants could not be punished for each animal stolen during a single episode of theft.[1] *Torres*, 2021-NMCA-045, ¶¶ 28-29. The Court of Appeals reasoned that Section 30-16-1(G) was ambiguous and that the statute's unit of prosecution could not be ascertained under *Herron*'s unit-of-prosecution framework. *Id.* ¶ 13. Stepping outside of the *Herron* framework, the Court of Appeals relied on the common-law rule known as the single-larceny doctrine, stating that "[w]hen we apply the single-larceny doctrine to interpret the unit of prosecution in the larceny of livestock provision, it clarifies that a taking of multiple head of cattle at the same time and place (single transaction), or a series of takings from a single owner with a single criminal intent (single intent), constitute[s] but one larceny" and holding that Defendants Torres and Hendrix could be prosecuted for each episode of

---

[1]The Court of Appeals memorandum opinion in *Chadwick*, A-1-CA-38561, mem. op. ¶ 4, affirmed the merger of Defendant Chadwick's charges under its reasoning in *Torres*, 2021-NMCA-045.

5

theft—respectively, two episodes for Defendant Torres and one for Defendant Hendrix. *Id.* ¶¶ 27-28.

{9}     The State petitioned for certiorari review. We granted the petitions and consolidated all three proceedings for review.

**III.     STANDARD OF REVIEW**

{10}     The United States and New Mexico Constitutions provide that an individual shall not "be twice put in jeopardy" for "the same offense." U.S. Const. amend. V; N.M. Const. art. II, § 15; *see Benton v. Maryland*, 395 U.S. 784, 794 (1969) (concluding that the Due Process Clause of the Fourteenth Amendment makes the double-jeopardy protections of the Fifth Amendment applicable to the states). We have explained that "[t]he double jeopardy clause . . . affords three levels of protection to a criminal defendant" in that (1) "[i]t protects against a second prosecution for the same offense after acquittal," (2) "[i]t protects against a second prosecution for the same offense after conviction," and (3) "it protects against multiple punishments for the same offense." *State v. Gallegos*, 2011-NMSC-027, ¶ 30, 149 N.M. 704, 254 P.3d 655.

{11}     In this appeal, Defendants focus on the double-jeopardy protection against multiple punishments for the same offense. *See Swafford v. State*, 1991-NMSC-043, ¶ 8, 112 N.M. 3, 810 P.2d 1223 ("The pivotal question in multiple punishment cases

6

is whether the defendant is being punished twice for the *same offense*."). Although this question is one of constitutional dimension, we must ultimately inquire into legislative intent, because "in the multiple punishment context, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Id.* ¶ 7 (brackets, internal quotation marks, and citation omitted).

{12}   "Multiple punishment problems can arise from both 'double-description' claims, in which a single act results in multiple charges under different criminal statutes, and 'unit-of-prosecution' claims, in which an individual is convicted of multiple violations of the same criminal statute." *State v. Bernal*, 2006-NMSC-050, ¶ 7, 140 N.M. 644, 146 P.3d 289 (citation omitted). Defendants stand accused of multiple counts of livestock larceny, so we here consider the intended unit of prosecution of Section 30-16-1(G). *See Swafford*, 1991-NMSC-043, ¶ 8 (explaining that "unit of prosecution" challenges are appropriate when "the defendant has been charged with multiple violations of a single statute based on a single course of conduct"). In a unit-of-prosecution case, "the relevant inquiry . . . is whether the legislature intended punishment for the [defendant's] entire course of conduct or for each discrete act." *Id.* "This analysis requires courts to determine the unit of prosecution intended by the Legislature by employing a two-part test, both parts of

which are concerned with legislative intent." *State v. Swick*, 2012-NMSC-018, ¶ 33, 279 P.3d 747. We review this question of law de novo. *State v. Olsson*, 2014-NMSC-012, ¶ 14, 324 P.3d 1230.

## IV. DISCUSSION

### A. We Construe the Unit of Prosecution of a Statute Using *Herron*'s Two-Step Framework

{13} In *Herron*, this Court elucidated a two-step framework for analyzing questions regarding the intended unit of prosecution of a criminal statute. 1991-NMSC-012, ¶¶ 6, 15. Both steps of our *Herron* analysis focus on discerning "whether a defendant has received more punishments than the number of punishments that the Legislature intended to authorize under the facts and circumstances of the case." *State v. Benally*, 2021-NMSC-027, ¶ 12, 493 P.3d 366. Thus, "[w]e are mindful that both stages of the unit of prosecution analysis turn on legislative intent." *Gallegos*, 2011-NMSC-027, ¶ 32. We first briefly outline these two steps and then apply them to this statute.

### 1. Step one: construing the statutory offense

{14} Under the first step of the *Herron* framework, the Court examines the charging statute for the intended unit of prosecution or, in other words, construes the statutory language "to determine what conduct the Legislature has defined as a statutory offense." *Benally*, 2021-NMSC-027, ¶ 13 (brackets, internal quotation marks, and citation omitted). In construing the intended unit of prosecution of a statute, the

Court considers "all markers of legislative intent . . . including the wording, structure, legislative history, legislative purpose, and quantum of punishment prescribed under the statutory scheme." *Id.* If the Court determines that the statute defines the unit of prosecution, "then the [C]ourt follows that language and the inquiry is complete." *Olsson*, 2014-NMSC-012, ¶ 18.

{15} If, after consideration of the applicable canons of construction, the Court is still unable to construe the intended unit of prosecution, then the Court applies the rule of lenity and resolves the ambiguity in favor of the defendant. *Swafford*, 1991-NMSC-043, ¶ 34 ("Unless an intent to punish separately can be found through application of the canons of construction . . . , lenity is indicated, and in that event, it is to be presumed the legislature did not intend pyramiding punishments for the same offense."). The rule of lenity essentially recognizes that a criminal defendant should be given "fair warning" as to what conduct is prohibited and as to what level of punishment will be accorded to that prohibited conduct. *State v. Santillanes*, 2001-NMSC-018, ¶ 34, 130 N.M. 464, 27 P.3d 456 ("[I]n the context of assessing a legislative intent to create multiple punishments, the application of the rule of lenity is consistent with the rule's purposes of ensuring that criminal statutes will provide fair warning concerning conduct rendered illegal." (brackets, internal quotation marks, and citation omitted)). However, "we will construe a statute in favor of a

9

defendant only when a reasonable doubt persists about a statute's intended unit of prosecution even *after* resort to the statute's wording, structure, legislative history, legislative purpose, and the quantum of punishment prescribed." *Benally*, 2021-NMSC-027, ¶ 15 (internal quotation marks and citation omitted). This is because "the meaning of language is inherently contextual," and thus a "court should rely on lenity only if, after seizing everything from which aid can be derived, it is left with an ambiguous statute." *State v. Edmondson*, 1991-NMCA-069, ¶ 12, 112 N.M. 654, 818 P.2d 855 (brackets and internal quotation marks omitted) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). If lenity is warranted, we will "presume that the Legislature did not intend to separately punish discrete acts in a defendant's course of conduct absent proof that each act was in some sense distinct from the others." *Benally*, 2021-NMSC-027, ¶ 16 (brackets, ellipsis, internal quotation marks, and citation omitted).

**2. Step two: indicia of distinctness**

{16}    The second step of the unit-of-prosecution framework analyzes the indicia of distinctness in light of the facts and circumstances of the case. *See Herron*, 1991-NMSC-012, ¶ 15; *State v. Ramirez*, 2018-NMSC-003, ¶ 56, 409 P.3d 902. This inquiry considers whether a defendant's course of conduct gives rise to a single, "same statutory offense" or whether the defendant's acts were distinct as to give rise

to multiple statutory offenses. *See Benally*, 2021-NMSC-027, ¶¶ 17, 23 ("[I]f we can reasonably infer that a defendant's acts were distinct under the applicable indicia of distinctness, then we will presume that the defendant has not received more punishments than were statutorily authorized."); *see also Swafford*, 1991-NMSC-043, ¶ 26 ("Clearly, if the defendant commits two discrete acts violative of the same statutory offense but separated by sufficient indicia of distinctness, then a court may impose separate, consecutive punishments for each offense."). Because the Court must be "mindful that both stages of the unit of prosecution analysis turn on legislative intent," our analysis of the indicia of distinctness is also "guided by the statute at issue, including its language, history, and purpose, as well as the quantum of punishment that is prescribed." *Gallegos*, 2011-NMSC-027, ¶¶ 32-33. Thus, "[i]n examining the indicia of distinctness, courts may inquire as to the interests protected by the criminal statute, since the ultimate goal is to determine whether the legislature intended multiple punishments." *Bernal*, 2006-NMSC-050, ¶ 14; *see also Swafford*, 1991-NMSC-043, ¶ 27 ("The conduct question depends to a large degree on the elements of the charged offenses and the facts presented at trial."). Deciding whether a defendant's acts were sufficiently distinct so as constitute separate offenses may involve factual determinations resolved by a jury. *Herron*, 1991-NMSC-012, ¶ 16. Whether the Legislature intended punishment for the entire course of conduct or for

each discrete act is a question of law subject to de novo review. *See, e.g.*, *Benally*, 2021-NMSC-027, ¶ 11 (indicating that *Benally* was "a unit of prosecution case where the relevant inquiry" was "whether the Legislature intended punishment for the entire course of conduct or for each discrete act. We review this question de novo." (brackets, internal quotation marks, and citations omitted)). Under this standard, we consider whether, on the facts herein, each Defendant's multiple charges violate double jeopardy.

{17}    If, after analysis of a defendant's conduct under the indicia of distinctness, the Court "can reasonably infer that a defendant's acts were distinct" offenses of the statute, "then we will presume that the defendant has not received more punishments than were statutorily authorized." *Id.* ¶ 23.; *see also State v. Morro*, 1999-NMCA-118, ¶ 10, 127 N.M. 763, 987 P.2d 420 (describing the indicia of distinctness as a "presumption" of legislative intent "that a defendant can be prosecuted for two separate offenses if the defendant's acts are 'separated by sufficient indicia of distinctness'" (citation omitted)). If, however, the defendant's acts did not reasonably give rise to multiple distinct offenses of the statute, then the Court presumes that the Legislature did not authorize multiple punishments. *See Herron*, 1991-NMSC-012, ¶¶ 21-22; *see also Bernal*, 2006-NMSC-050, ¶ 14 ("If the acts are not sufficiently distinct, then the rule of lenity mandates an interpretation that the

12

legislature did not intend multiple punishments, and a defendant cannot be punished for multiple crimes.").

**B.    Section 30-16-1(G) Does Not Authorize Multiple Punishments Based on the Number of Animals Stolen in a Single Episode**

{18}    Applying the first step of our *Herron* framework, we hold that Section 30-16-1(G) does not express an intent to prosecute Defendants for each animal they have allegedly stolen; instead, the statute expresses an intent to prosecute Defendants for each episode of theft.

**1.    Statutory language**

{19}    We begin with an analysis of the statutory language as the "primary indicator of legislative intent." *Olsson*, 2014-NMSC-012, ¶ 18. New Mexico's larceny statute defines larceny as "the stealing of anything of value that belongs to another." Section 30-16-1(A). Subsection (G), the subsection with which we are primarily concerned, provides, "Whoever commits larceny when the property of value stolen is livestock is guilty of a third degree felony regardless of its value." Section 30-16-1(G).

{20}    The parties advocate for vastly different readings of this language. They primarily center their dispute on the word *livestock*, with each party suggesting that the word supports the party's proffered unit of prosecution. The Court of Appeals concluded that the word *livestock* could be "both singular and plural" and thus "provide[d] no clear indication of a unit-of-prosecution." *Torres*, 2021-NMCA-045,

¶ 13 (internal quotation marks omitted) (quoting *State v. Tidey*, 2018-NMCA-014, ¶ 10, 409 P.3d 1019). We disagree with the Court of Appeals conclusion that, because the word *livestock* can be read as singular or plural, the wording of the statute provides no clear indication of a unit of prosecution.

{21} The New Mexico Criminal Code does not define the term *livestock*. Nevertheless, various other statutory provisions define *livestock* as referring to herds or groups of domesticated animals. *See, e.g.*, NMSA 1978, § 7-35-2(D) (2018) ("As used in the Property Tax Code . . . 'livestock' means cattle, buffalo, horses, mules, sheep, goats, swine, ratites and other domestic animals useful to humans."); NMSA 1978, § 77-2-1.1(A) (2015) ("As used in the Livestock Code . . . 'animals' or 'livestock' means all domestic or domesticated animals that are used or raised on a farm or ranch, including the carcasses thereof, and exotic animals in captivity and includes horses, asses, mules, cattle, sheep, goats, swine, bison, poultry, ostriches, emus, rheas, camelids and farmed cervidae upon any land in New Mexico."); NMSA 1978, § 77-1B-2(K) (2017, repealed effective July 1, 2024) ("'[L]ivestock' means all domestic or domesticated animals that are used or raised on a farm or ranch and exotic animals in captivity and includes horses, asses, mules, cattle, sheep, goats, swine, bison, poultry, ostriches, emus, rheas, camelids and farmed cervidae but does not include canine or feline animals."); NMSA 1978, § 77-16-2 (1977)

14

("'[L]ivestock' shall include domestic animals such as cattle, horses, sheep, hogs, goats and buffaloes."). In ordinary usage, *livestock* is a noncount or mass noun, which is neither singular nor plural, but describes an "aggregation" which is "taken as an indeterminate whole."[2] Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 22 (2016). Thus, we understand *livestock* to refer either to a single animal or to multiple animals in indeterminate numbers.

{22} In contrast to the Court of Appeals, we do not conclude that this indeterminacy renders the statutory language ambiguous. As a general principle, the use of singular or plural language in a criminal statute may, in some circumstances, clarify the intended unit of prosecution. *See, e.g.*, *Ramirez*, 2018-NMSC-003, ¶¶ 52-53 ("It is well established . . . that where a statute prohibits the doing of some act to a victim specified by a singular noun, 'a person' for example, then 'the person' is the unit of prosecution."). However, the use of singular or plural language is not always

_____

[2]It also should be noted that "[m]any nouns can be both count . . . and mass . . . depending on the sense." Bryan A. Garner, *Garner's Modern English Usage*, 227 (4th ed. 2016). Indeed, the *Oxford Dictionary* identifies "livestock" as either a mass or a plural noun. *Livestock*, *Oxford Advanced American Dictionary*, https://www.oxfordlearnersdictionaries.com/us/definition/american_english/livestock (last visited Sept. 20, 2022) ("noun (uncountable, plural)"); *see also Livestock*, *Black's Law Dictionary* (11th ed. 2019) (defining "livestock" in the plural as "*n.* (18c) Farm animals; specif., domestic animals and fowls . . . ."). Thus, the term *livestock* is potentially either a mass noun or a plural noun, depending on use. Either usage suggests that the Legislature did not intend to authorize multiple punishments based on the number of animals stolen.

dispositive as to legislative intent. *See, e.g.*, NMSA 1978, § 12-2A-5(A) (1997) ("Use of the singular number includes the plural, and use of the plural number includes the singular."). We view this canon as relevant here. Specifically, the word *livestock*, which is neither singular nor plural, suggests that the Legislature did not contemplate a unit of prosecution based on the count or number of animals stolen in a single episode of theft.

{23} The language of the livestock larceny statute supports this reading. The statute punishes the larceny of livestock as "a third degree felony *regardless of its value*." Section 30-16-1(G) (emphasis added). This contrasts with the portion of the larceny statute addressing the theft of generic property, which provides for "gradations of punishment based on the monetary value of the property." *State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 41, 136 N.M. 309, 98 P.3d 699; *see also State v. Graves*, 1915-NMSC-076, ¶ 7, 21 N.M. 556, 157 P. 160 (concluding that an 1884 statute prohibiting the larceny of livestock was not impliedly repealed by an 1891 act addressing general larceny, explaining that livestock larceny is "an act in special form, enacted for the particular protection of livestock, while the other was a general act defining the punishment of larceny, graded according to the value of the property stolen"). Subsections (B) through (F) of the larceny statute address the theft of generic property, with gradations of punishment accorded in relation to the value of

16

property stolen. *Compare* § 30-16-1(B) (punishing the larceny of property valued at $250 or less as a petty misdemeanor), *with* § 30-16-1(F) (punishing the larceny of property valued over $20,000 as a second-degree felony). *See also State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 41, (discussing the structure of the larceny statute). Subsection (H) punishes, as a fourth-degree felony, the theft of the specific property of a firearm valued less than $2,500. Section 30-16-1(H). The Legislature's choice to punish the livestock larceny "regardless of its value" suggests that neither the potential market value of the property stolen nor, by logical extension, the number of animals stolen is relevant to prosecution under Section 30-16-1(G). As it stands, the language of the statute does not draw divisions based on number.

{24}    In short, the State's suggested per-animal unit of prosecution is neither supported nor contemplated by the statutory language, and we will not construe Section 30-16-1(G) as meting out punishment for each animal stolen when the statute contemplates prosecution for the theft of anywhere from a single animal to an entire herd. *Cf. Swick*, 2012-NMSC-018, ¶ 35 (refusing the state's asserted unit of prosecution of the aggravated burglary statute because the state's "contentions are not supported or contemplated by the statute and we therefore decline to divide one offense into separate means used to accomplish the ultimate goal"). Although the unit of prosecution under Section 30-16-1(G) is not immediately clear based on the

statutory language alone, what is clear is that it does not support a unit of prosecution based on the number of animals stolen. Rather, we understand the language as focusing prosecution on the prohibited act of larceny itself. *See* § 30-16-1(A), (G) ("Larceny consists of *the stealing of anything of value* that belongs to another . . . [, and w]hoever *commits larceny* when the *property of value* stolen is livestock is guilty of a third degree felony *regardless of its value*." (emphasis added)).

**2.      Legislative history**

{25}      Our reading of Section 30-16-1(G) as creating a unit of prosecution based on an episode of theft is also supported by the history of the statute. Once the practice of livestock raising gained foothold, the ownership and keeping of livestock became of vital significance to many New Mexicans. *See* Carol Raish & Alice McSweeney, *Livestock Ranching and Traditional Culture in Northern New Mexico*, 41 Nat. Res. J. 713, 714-18 (2001). Even today, the ranching industry remains an economic mainstay of the state.[3]

---

[3]*See* U.S. Dep't of Agric., *2017 Census of Agriculture – New Mexico*, Vol. 1, Part 31, at 9, https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/ Volume_1_Chapter_1_State_Level/New_Mexico/nmv1.pdf (last visited Sept. 20, 2022) (reporting approximately $1.93 billion in market value of agricultural products sold in the 2017 calendar year for New Mexico farms producing "[l]ivestock, poultry, and their products").

{26}     Since the mid-nineteenth century, our territorial and state legislatures have made special provision for the punishment of livestock larceny.[4] Throughout this

---

[4]Multiple laws have been enacted to address various methods of unlawfully taking livestock, such as by the driving away, selling, or butchering of the animal or animals; but for laws specifically addressing the larceny of livestock, *see* Kearny Code of Laws, *Crimes and Punishments,* Art. I, § 4 (1846) ("[A]ny person convicted of stealing any horse, mare, gelding, mule, ass, sheep, hog or goat, shall be sentenced to not more than seven, nor less than two years imprisonment at hard labor, or to receive not more than one hundred nor less than twenty stripes well laid on his bare back."); Revised Laws of the Territory of New Mexico, Art. XXIII, Ch. LII, § 37 (1865) (punishing theft of a "horse, mare, colt, or filly, horsemule or maremule, ass or jennet, bullock, cow or calf, sheep, goat or hog" with "not less than thirty lashes, well laid on his bare back, nor more than sixty" and confinement "until the costs of the prosecution are paid and the sentence fully complied with"); 1880 Gen. Laws of New Mexico, Art. XXIII, Ch. LII, § 37 (1870) ("Every person who shall be convicted of stealing a horse, mare, colt or filly, horsemule or maremule, ass or jennet, bullock, cow or calf, sheep, goat or hog . . . shall be fined not less than ten dollars nor more than five hundred dollars, or be imprisoned not less than one month nor more than five years, or both, in the discretion of the court."); 1884 Compiled Laws of New Mexico, Title II, Ch. 1, § 68 (punishing the stealing of "any neat cattle, horse, mule, sheep, goat, swine, or ass" with one to five years imprisonment and a fine of $500 to $5,000); 1884 Compiled Laws of New Mexico, Title II, Ch. 1, § 69 (explaining that "[a]ll cases which are by this act declared to be larceny, and in all cases of felonious taking . . . of any animal or animals herein referred to, the same shall be deemed . . . grand larceny" which is punished by imprisonment for one to ten years, "notwithstanding the value of such animal or animals may be less than twenty dollars"). The 1884 livestock larceny statutes persisted in essentially the same form until 1963. *See* 1897 Compiled Laws of New Mexico, Title II, Ch. 1, §§ 79-80; NMSA 1915, Ch. XXVI, Art. XX, §§ 1613-14; NMSA 1929, Ch. 35, Art. 24, §§ 35-2405 to -2406; NMSA 1941, Ch. 41, Art. 4, §§ 41-419 to -420; NMSA 1953, §§ 40-4-17 to -18 (repealed 1963); NMSA 1953, § 40A-16-1 (1963) (Vol. 6, Repl. 1964) ("Whoever commits larceny when the thing of value stolen is livestock is guilty of a third degree felony regardless of its value.").

time, "New Mexico has consistently treated the larceny of livestock differently from the larceny of other things, in that the punishment for the larceny of livestock has never depended upon the value of the particular animal stolen." *State v. Pacheco*, 1969-NMCA-127, ¶ 12, 81 N.M. 97, 463 P.2d 521; *see also State v. Lucero*, 1913-NMSC-011, ¶ 3, 17 N.M. 484, 131 P. 491 (recognizing that "value is not material" in a prosecution for livestock larceny). This special treatment has been accorded to the crime of livestock larceny in order "to protect the ownership of a certain class of property." *Pacheco*, 1969-NMCA-127, ¶¶ 12, 15 (internal quotation marks and citation omitted). As such, laws prohibiting the larceny of livestock often operated as part of comprehensive regulatory schemes designed to protect the owners and keepers of livestock and New Mexico's ranching industry. *See id.*; 1897 Compiled Laws of New Mexico, Title II, §§ 64-240 (setting forth the New Mexico "Animals" code, of which the 1884 livestock larceny statutes were a part).

{27}    The livestock larceny statute was amended to its present form in 1963, with the most notable changes being the substitution of the word *livestock* for the former statutory listings of the "animal or animals," NMSA 1953, §§ 40-4-17, -18, and the incorporation of the crime as a subsection of the larceny statute under the revised Criminal Code. 1963 N.M. Laws, Ch. 303, § 16-1; NMSA 1953, § 40A-16-1 (1963) (Vol. 6, Repl. 1964). By 1963, technological advancements had transformed the

historic crime of livestock larceny in that the wider availability of motorized vehicles and trailers enabled the theft of a greater number of animals in a single episode of theft. Yet, we understand that many of the policies that motivated our territorial and early state legislatures in punishing livestock larceny also likely motivated our 1963 Legislature in enacting what is now Section 30-16-1(G). *Cf. Pacheco*, 1969-NMCA-127, ¶ 15 (quoting *Wilburn v. Territory*, 1900-NMSC-028, ¶ 7, 10 N.M. 402, 62 P. 968 (describing, as the purpose of laws prohibiting livestock larceny, to protect the industry of stock raising), *overruled on other grounds as recognized by State v. Smith*, 1915-NMSC-085, ¶ 6, 21 N.M. 173, 153 P. 256).

{28}     In the first years of statehood, this Court considered a question of duplicity under the 1884 livestock larceny statutes. *State v. Klasner*, 1914-NMSC-015, ¶¶ 1-5, 19 N.M. 474, 145 P. 679. Duplicity is a question that is corollary to the question of multiplicity that we consider here. *See Herron*, 1991-NMSC-012, ¶ 6 n.4 ("We use the term 'multiplicity' to describe the situation when an indictment charges a single offense in different counts."); 41 Am. Jur. 2d, *Indictments and Informations* § 198 (2015) ("A duplicitous count of an indictment or information joins two or more distinct and separate offenses in the same count."). The defendant in *Klasner* was charged with taking the animals "at the same time and place." *Klasner*, 1914-NMSC-015, ¶ 2. This Court concluded that an indictment charging the defendant in

one count with stealing several head of cattle from multiple owners was not faulty due to duplicity. *Id.* ¶ 5. The Court held that the taking of multiple animals from multiple owners at one time was "but a single act or transaction in violation of the law against larceny," and thus the indictment could be said to allege "but a single offense." *Id.* ¶¶ 3, 5 (internal quotation marks and citation omitted).

{29}     As a basis for its holding, *Klasner* applied the same doctrine applied by the Court of Appeals in this case: the single-larceny doctrine. *Id.* ¶¶ 3-5. The single-larceny doctrine was expressly adopted by this Court in *State v. Allen*, 1955-NMSC-015, ¶¶ 4-7, 59 N.M. 139, 280 P.2d 298. It counsels, "when several articles of property are stolen by the defendant from the same owner at the same time and at the same place, only one larceny is committed." *State v. Rowell*, 1995-NMSC-079, ¶ 15, 121 N.M. 111, 908 P.2d 1379 (brackets and internal quotation marks omitted) (quoting 3 Charles E. Torcia, *Wharton's Criminal Law* § 358 (14th ed. 1980)). The doctrine is justified by the rationale that "there has been but one transaction" or "but one criminal intent" in the act of theft. *State v. Boeglin*, 1977-NMCA-004, ¶¶ 7-8, 90 N.M. 93, 559 P.2d 1220; *see also* 50 Am. Jur. 2d, *Larceny* § 4 (2017) ("The rationale behind the rule is that the taking of several articles at the same time from the same place is pursuant to a single intent and design and is part of a single scheme or continuing course of conduct." (footnote omitted)). In the multiple-punishment

context this doctrine is best explained by the analogy, as "a theft of one thousand dollars is one theft and not a thousand thefts, and the defendant can be prosecuted only once for the offense." *Boeglin*, 1977-NMCA-004, ¶ 9.

{30} In the opinion now under review, the Court of Appeals relied on the single-larceny doctrine to resolve what it perceived to be a stalemate in its *Herron* analysis. *Torres*, 2021-NMCA-045, ¶¶ 22-28. We disagree with that reasoning, as we do not view the doctrine as providing an alternative to *Herron*'s unit-of-prosecution framework. *Cf. State v. Bernard*, 2015-NMCA-089, ¶ 21, 355 P.3d 831 ("We decline to extend the single-larceny doctrine to this case. Even though our courts have recognized the validity of the single-larceny doctrine, we see no indication that the doctrine supersedes the well-established two-step legislative intent inquiry in a unit of prosecution case." (citation omitted)).

{31} We again emphasize that "the relevant inquiry" in a unit-of-prosecution analysis "is whether the legislature intended punishment for the entire course of conduct or for each discrete act." *Swafford*, 1991-NMSC-043, ¶ 8. We have explained that "the [single-larceny] doctrine is a canon of construction used when the Legislature's intent regarding multiple punishments is ambiguous." *Alvarez-Lopez*, 2004-NMSC-030, ¶ 43. However, we will not apply the single-larceny doctrine if legislative intent is unambiguous, *id.*, or if the doctrine appears contrary

23

to legislative intent. *See Rowell*, 1995-NMSC-079, ¶¶ 15-20 (noting that the Legislature worked to restrict the application of the single-larceny doctrine to embezzlement cases after *State v. Brooks*, 1994-NMSC-062, 117 N.M. 751, 877 P.2d 557, and declining incidentally to extend the doctrine to attempted fraud under the Computer Crimes Act); *see also State v. Boergadine*, 2005-NMCA-028, ¶ 29, 137 N.M. 92, 107 P.3d 532 (declining to extend the single-larceny doctrine to fraud pursuant to legislative outcomes of *Brooks*). The single-larceny doctrine may at times appear redundant to the unit-of-prosecution analysis. *See State v. Brown*, 1992-NMCA-028, ¶ 13, 113 N.M. 631, 830 P.2d 183 (analyzing the unit of prosecution of generic larceny under the *Herron* framework and noting that "had we applied [the single-larceny doctrine] rather than *Herron*, we would have reached the same result"). Nevertheless, resort to the single-larceny doctrine in lieu of full consideration of legislative intent under *Herron*'s framework may lead to inconsistency in results. *Cf. Morro*, 1999-NMCA-118, ¶ 22 (noting potential inconsistency between the unit-of-prosecution analysis and the single-larceny doctrine because "[t]he single-larceny doctrine is a departure from the general rule that multiple charges are appropriate when there are multiple victims"). We thus disavow the single-larceny doctrine as a separate basis for our decision.

{32}     We acknowledge that the single-larceny doctrine remains useful in a

24

legislative-intent analysis insofar as it informs our historical understanding of the livestock larceny statute. *Cf. Morro*, 1999-NMCA-118, ¶ 23 ("When there is a long history regarding the unit of prosecution under a particular statute, as there is with the single-larceny doctrine, then principles of stare decisis in statutory interpretation argue strongly for continuing that interpretation, even when the tools—that is, canons—of statutory interpretation have evolved with respect to analyzing the question."). Applied in this way, the doctrine suggests that the Legislature was aware that the theft of multiple head of cattle at the same time and in the same place has been construed to give rise to a single offense. *Klasner*, 1914-NMSC-015, ¶¶ 1-5; *see also* NMSA 1978, § 12-2A-20(B)(2) (1997) (identifying as an aid to statutory construction "a judicial construction of the same or similar statute or rule of this or another state"). Given the construction long accorded to the crime of livestock larceny, the Legislature could have defined a different unit of prosecution when it promulgated Section 30-16-1(G). *Cf.* NMSA 1915, §§ 1624, 1625 (1897) (prohibiting the detaining of another person's cattle for purposes of milking and providing that "[t]he taking up and detention of each and every cow or calf . . . shall constitute a separate offense"). But the Legislature did not do so. We therefore view *Klasner* and the history of Section 30-16-1(G) as supporting our conclusion that the Legislature did not intend a unit of prosecution based on the number of animals

stolen in an episode of theft.

**3.      Legislative purpose**

{33}      In *Wilburn*, 1900-NMSC-028, ¶ 7, this Court described the purpose of laws prohibiting livestock larceny as "either to prevent a kind of thefts peculiarly easy of commission and difficult of discovery and punishment, or to afford special protection to the important industry of stock-raising, or . . . upon both these considerations." While the parties do not dispute the applicability of this purpose to the present appeal, they do dispute what this purpose reveals about the unit of prosecution of Section 30-16-1(G).

{34}      The State argues that this legislative purpose reveals a unit of prosecution based on the number of animals stolen. The State asserts that, if the unit of prosecution were held to be otherwise, then rustlers will be incentivized to steal as many head as possible in one episode of theft. Defendants, on the other hand, argue that Section 30-16-1(G) promotes the legislative purpose of prevention by relieving the State from the discovery and punishment burdens of establishing either the value or the precise number of animals taken. Defendants assert that this purpose reveals that the unit of prosecution is for each episode of livestock theft.

{35}      We agree with Defendants. Specifically, we conclude that the purpose of Section 30-16-1(G) protects livestock owners by facilitating prosecution of a crime

that historically and still remains "peculiarly easy of commission and difficult of discovery and punishment." *Pacheco*, 1969-NMCA-127, ¶ 15 (internal quotation marks and citation omitted). We reach this conclusion, in part, by construing Section 30-16-1(G) in light of New Mexico's Livestock Code, NMSA 1978, §§ 77-2-1 to 77-18-6 (1869, as amended through 2017), and other laws addressing livestock. Consistent with the history of livestock larceny, Section 30-16-1(G) clearly is intended to work in collaboration with these statutes and thus should be considered a part of a comprehensive regulatory scheme addressing livestock in New Mexico. *See* § 12-2A-20(B)(2) (articulating that "the following aids to construction may be considered in ascertaining the meaning of [a statute]: . . . a statute or rule on the same or a related subject, even if it was enacted or adopted at a different time"); 2B Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Constr.* § 51:3, at 222 (7th ed. 2012) ("Statutes are *in pari materia*—pertain to the same subject matter—when they relate to the same person or thing, to the same class of persons or things, or have the same purpose or object." (footnote omitted)). We thus construe Section 30-16-1(G) in pari materia with these livestock laws and relevant provisions of the Livestock Code.

{36} The stated purpose of the Livestock Code in pertinent part is "to control disease, to prevent the theft or illegal movement of livestock and to oversee the New

Mexico meat inspection program." Section 77-2-1. In pursuit of that purpose, the Livestock Code contains provisions addressing the control of livestock diseases, §§ 77-3-1 to -18, the marking or branding of animals, §§ 77-9-2 to -57, and the inspection of livestock prior to transport, §§ 77-9-41, -42. The Livestock Code also grants authority to the New Mexico Livestock Board to oversee and regulate livestock, §§ 77-2-1 to -32.

{37} The State argues that the Livestock Code reveals a legislative intent to prosecute livestock larceny on a per-animal basis and particularly relies for this argument on *Bernard*, 2015-NMCA-089, ¶¶ 15-31. In *Bernard*, the Court of Appeals analyzed the unit of prosecution for receiving or transferring a stolen motor vehicle, NMSA 1978, § 30-16D-4(A) (2009). *See Bernard*, 2015-NMCA-089, ¶¶ 18-19. As part of its analysis of the indicia of distinctness, the *Bernard* Court noted that the stolen vehicles were "subject to broad regulation by the State under a highly specific statutory scheme found in the Motor Vehicle Code and the Criminal Code." 2015-NMCA-089, ¶ 28. That statutory scheme tracked individually identified vehicles as a means to deter vehicle theft. *Id.* ¶¶ 28-30. In light of this scheme, the *Bernard* Court concluded that the defendant's receipt of each one of four stolen vehicles was sufficiently distinct to warrant four separate offenses of Section 30-16D-4(A). *Id.* ¶ 31.

28

{38} Applying *Bernard*, the State suggests that the Livestock Code is a highly specific regulatory scheme that tracks animals like the Motor Vehicle Code tracks vehicles. We disagree. The Livestock Code does not track individual *animals*, but instead tracks an individual *person's* ownership of these animals. *See, e.g.*, § 77-2-7.1 (making brands that are recorded with the New Mexico Livestock Board as the "personal property of the person in whose name they are recorded," which can be "transferred in the same manner as other personal property"); § 77-9-3(A) ("A person who owns livestock shall have and adopt a brand for them . . . . Each brand shall be recorded in the office of the [Livestock Board]."); § 77-2-7.7. ("It is unlawful for an owner of livestock in originally marking or branding livestock to make use of or keep up more than one mark or brand."); *see also* NMSA 1978, § 39-6-1 (1889) (addressing the levy of "any writ of attachment, replevin or execution under the laws of this state upon any livestock or herd of cattle that are ranging at large with other livestock or cattle" through the filing of a copy of the writ on the livestock owner's brand). The portion of the Livestock Code setting forth the requirements for "Brands, Ownership, Transportation and Sale of Animals," §§ 77-9-2 to -57, specifically emphasizes that a person must maintain proof of ownership of livestock as a means to prevent theft. *See, e.g.*, §§ 77-9-45, -46, -51 (addressing

29

circumstances in which a livestock inspector may seize livestock due to the failure of a person in possession of livestock to provide proof of ownership).

{39} The Legislature has also specifically provided that "[i]n the prosecution of any offense arising under the laws of this state in regard to the unlawful taking . . . of animals of the bovine kind, the description 'neat cattle' in any indictment shall be deemed sufficient." NMSA 1978, § 31-7-1 (1895). An indictment identifies stolen livestock through a description of the livestock owner's brand. *See id.* ("[T]he proof of the brand by a certified copy of the registration thereof in the brand book . . . shall be sufficient to identify all horses, mules, asses or neat cattle, and shall be prima facie proof that the person owning the recorded brand is the owner of the animal branded with such brand."). This suggests that the Legislature did not contemplate that prosecutions for livestock larceny would draw distinctions based on the description or identity of an animal.

{40} We thus view the Livestock Code as creating a regulatory scheme with an overriding purpose of protecting livestock ownership by deterring livestock theft. Section 30-16-1(G) assists in this purpose by relieving the state of the burden of establishing either the value or the number of animals stolen in an episode of theft and by making livestock larceny a third-degree felony whenever livestock is stolen, irrespective of the enormity of the livestock owner's loss.

{41} The facts on current appeal, which included investigations by employees of the New Mexico Livestock Board, aptly demonstrate how Section 30-16-1(G) operates in tandem with relevant provisions of the Livestock Code to facilitate discovery and prosecution of livestock theft. Defendant Torres's alleged crime was discovered when an operations manager at the Crossroads Cattle Company's ranch noted a discrepancy between the estimated number of calves expected in a pasture and the number of calves inventoried. Pursuant to a report from the ranch to the Livestock Board, investigators were able to link Defendant Torres to the sale of eighteen calves on two dates through the records maintained by a livestock auction house. *See, e.g.*, § 77-10-3(C) (requiring operators of New Mexico licensed auction houses to allow the Livestock Board "to have convenient access to the . . . books and records or any livestock that may be in [the operator's] possession at all reasonable times for the purpose of inspection"); § 77-10-4 (requiring the operator to notify the Livestock Board of any livestock received). Using these records, prosecutors were able to determine precisely how many animals Defendant Torres stole and connect him potentially with two episodes of theft.

{42} Similarly, the Livestock Code also facilitated discovery of Defendants Chadwick's and Hendrix's alleged crime. This theft was first discovered when an off-duty livestock inspector saw these Defendants transporting cattle that had not

been inspected and approved for shipment. *See, e.g.*, §§ 77-9-42 to -43 (requiring inspection prior to transportation of livestock). This legislative scheme likewise allowed investigators to identify these Defendants and to inspect and confiscate the stolen animals when they arrived at the auction house. *See, e.g.*, § 77-9-45 ("If any duly authorized inspector should find any livestock or carcasses in the possession of any person . . . [who] cannot furnish other satisfactory proof of lawful ownership or said inspector has good reason to believe that said livestock or carcasses, are stolen, said inspector shall . . . seize and take possession of same."). Thus, the overall legislative scheme assisted in the discovery and investigation of an offense which otherwise may have escaped prosecution.

{43}     We therefore conclude that the holding in *Bernard*, 2015-NMCA-089, ¶¶ 28-30, is inapposite. The Motor Vehicle Code at issue in *Bernard* establishes "a vehicle registration system that maintains a history of individual vehicle ownership, requires distinct identifiers to be assigned and affixed to vehicles, and monitors the transfer of vehicles from other states and between owners." *Id.* ¶ 29. The Livestock Code, on the other hand, establishes a system focused on maintaining a record of persons owning livestock, but is not concerned with establishing the identity of any animal so owned. Thus, analysis of the purpose of the livestock larceny statute, § 30-16-1(G), does not support the State's asserted per-animal unit of prosecution.

32

## 4. Quantum of punishment

{44} Our conclusion that livestock larceny does not support multiple punishments for the theft of multiple animals in a single episode is also supported by the quantum of punishment. *Benally*, 2021-NMSC-027, ¶¶ 31-32 (considering the severity and comparative length of a sentence based on multiple punishments in construing a crime's unit of prosecution). Livestock larceny, § 30-16-1(G), is a third-degree felony with a basic sentence of three years and a potential fine not exceeding $5,000. NMSA 1978, § 31-18-15(A)(11), (E)(11) (2016, amended 2022). If multiple punishments were to be permitted, Defendant Torres would face a potential sentence of fifty-four years imprisonment and fines totaling $90,000; Defendants Chadwick and Hendrix each would face potential imprisonment of seventy-five years and fines totaling $125,000.

{45} Defendants contend that potential sentences of this severity argue against prosecution for each animal stolen. Defendants posit that if this Court accepts the State's analysis, a hypothetical rustler who steals one-hundred head of cattle would face a three-hundred year sentence. The State counters that "the specter of a 300-year prison term" is "highly improbable" because Article II, Section 13 of the New Mexico Constitution "prohibits the infliction of 'cruel and unusual punishment.'"

{46} The State's suggestion that the Constitution will limit the potential cruelty of this hypothetical rustler's sentence is at odds with the canon of constitutional avoidance. *See, e.g., State v. Radosevich*, 2018-NMSC-028, ¶ 8, 419 P.3d 176 ("[W]e must be guided by the 'well-established principle of statutory construction that statutes should be construed, if possible, to avoid constitutional questions.'"); NMSA 1978, § 12-2A-18(A)(3) (1997) ("A statute or rule is construed, if possible, to . . . avoid an unconstitutional, absurd or unachievable result."). The analysis provided herein avoids the need to test the constitutional limits of a Section 30-16-1(G) prosecution.

{47} Defendants also point out that their potential sentences for stealing a herd of livestock are, by the State's assertions, much greater than even the most serious category of generic larceny, which punishes theft of property valued over $20,000 as a second-degree felony carrying a basic sentence of nine years. Section 30-16-1(F); § 31-18-15(A)(7)(2016). Defendants would be incarcerated for much longer than nine years if each potential term of imprisonment were to run consecutively. We agree that this disparity is telling and further confirms that the Legislature did not intend Defendants to receive multiple punishments for the theft of multiple head of cattle in a single episode.

{48} We conclude that the wording, structure, purpose, history, and quantum of punishment of the livestock larceny statute, § 30-16-1(G), do not express an intent to prosecute Defendants for each animal stolen. We construe the statute as expressing an intent to prosecute Defendants for each distinct episode of theft. Because we were able to construe the intended unit of prosecution of Section 30-16-1(G) through consideration of the preceding canons of construction, we do not resort to the rule of lenity for this conclusion. *Benally*, 2021-NMSC-027, ¶¶ 14-15. We therefore hold that Defendants' indictments are multiplicitous.

## C. Defendants May Be Prosecuted for Each Distinct Episode of Livestock Larceny

{49} Defendants raised the issue of multiplicity prior to conviction. Multiplicity is not fatal to an indictment, and a trial court in its discretion may dismiss the multiplicitous charges, may require the state to elect between charges, or may proceed to trial with appropriate jury instructions. *See, e.g.*, *United States v. Johnson,* 130 F.3d 1420, 1426-27 (10th Cir. 1997) ("A decision of whether to require the prosecution to elect between multiplicitous counts before trial is within the discretion of the trial court."); *United States v. Roy*, 408 F.3d 484, 491 (8th Cir. 2005) ("Although the prosecutor did not elect between or consolidate the multiplicitous counts, multiplicitous indictments may be saved at the trial stage if the district court submits an appropriate instruction to the jury."); *see also* 42 C.J.S.

35

*Indictments* § 230, at 709 (2017) (noting that multiplicity is not fatal to an indictment and listing remedies for multiplicity as including dismissal of the multiplicitous counts, the state's election of counts, or the vacating of convictions). We conclude that the district court did not abuse its discretion in electing to dismiss all but one of the livestock larceny charges in Defendants Chadwick's and Hendrix's indictments and in electing to dismiss all but two of the livestock larceny charges in Defendant Torres's indictment. *See, e.g.*, *State v. Lymon*, 2021-NMSC-021, ¶ 12, 488 P.3d 610 ("An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case" or "when the trial court misapprehends or misapplies the law." (internal quotation marks and citation omitted)).

{50}   "When an indictment includes multiple counts charging a violation of the same statutory provision and a claim of multiplicity is raised, an inquiring court must determine whether the facts undergirding each count can be treated as a distinct unit of prosecution." *Lente*, 2019-NMSC-020, ¶ 26 (internal quotation marks and citation omitted). In ascertaining which of Defendants' charges may be treated as distinct units of prosecution, we are guided by the second step of our *Herron* analysis. *Herron*, 1991-NMSC-012, ¶ 15. In *Herron*, we articulated six indicia of distinctness that we may use to clarify which of a defendant's acts gave rise to a discrete statutory offense: (1) the time between the defendant's acts, (2) the location of the victims,

36

(3) the existence of intervening events between acts, (4) the sequence in commission of the acts, (5) the defendant's intent, and (6) the number of victims. *Id*. However, the Court has explained that the six indicia identified in *Herron* "serve as a general policy for examining distinctness" but that these indicia do not provide a "mechanical formula" for analysis. *Benally*, 2021-NMSC-027, ¶ 19 (internal quotation marks and citation omitted). The specific indicia analyzed are dependent on the interests protected by the statute at issue "because our focus under this second step is whether a defendant's acts can be distinguished as discrete violations of the conduct the Legislature intended to proscribe." *Id*. ¶ 18.

{51} As relevant to the crime of larceny of generic property, § 30-16-1(B)-(F), our Court of Appeals has considered "the time between the criminal acts, the location of the property when it was taken, the existence of any intervening events, distinctions in the manner of committing the thefts, the defendant's intent, and the number of victims." *Brown*, 1992-NMCA-028, ¶ 9. Although *Brown* considered the indicia of distinctness relevant to the crime of larceny of generic property, § 30-1-16(B)-(F), we view these indicia as also relevant to the crime of livestock larceny, § 30-16-1(G). In keeping with the history and purpose of the livestock larceny statute, we clarify that the victims of livestock larceny are the owners of the livestock.

{52} Defendants Chadwick and Hendrix—who allegedly stole livestock on one occasion, from one location, and from one owner—each should be prosecuted for no more than one offense of Section 30-16-1(G). Defendant Torres—who allegedly stole livestock on potentially two occasions, from one location and from one owner—should be prosecuted for no more than two offenses of Section 30-16-1(G). Resolution of whether Defendant Torres may be punished for two offenses of Section 30-16-1(G) will depend on the jury's findings on outstanding factual issues and on whether the two offenses were distinct. *Herron*, 1991-NMSC-012, ¶¶ 15, 16.

## V. CONCLUSION

{53} In view of the foregoing, we affirm the holding of the Court of Appeals, with amendments to its reasoning as reflected herein. We remand each of these three matters to the Twelfth Judicial District Court for further proceedings consistent with our opinion.

{54} **IT IS SO ORDERED.**

---

**DAVID K. THOMSON, Justice**

**WE CONCUR:**

---

**C. SHANNON BACON, Chief Justice**

_____

**MICHAEL E. VIGIL, Justice**


_____

**JULIE J. VARGAS, Justice**


_____

**BRIANA H. ZAMORA, Justice**

39